851 P.2d 471

**Nora SEGAL, Plaintiff–Appellee and Cross–Appellant,**

v.

**Len GOODMAN, Defendant–Appellant and Cross–Appellee.**

**No. 20505.**

Supreme Court of New Mexico.

March 31, 1993.

Sutin, Thayer & Browne, Saul Cohen, Santa Fe, for defendant-appellant.

Rose, Kohl & Davenport, Ltd., Bruce R. Kohl, Sue A. Herrman, Santa Fe, for plaintiff-appellee.

## OPINION

MONTGOMERY, Justice.

Defendant-appellant Len Goodman appeals from a judgment awarded to plaintiff-appellee Nora Segal, holding that Goodman was liable for damages suffered by Segal as a result of an investment in an unregistered security. Segal cross-appeals from the court's order granting Goodman a stay of execution of the judgment. We affirm the judgment on the ground that

substantial evidence supports the trial court's finding that Goodman was a salesman or agent of a seller of an unregistered security, affirm the court's stay of execution on the ground that the court did not abuse its discretion in ordering it, and remand for reconsideration of the duration of the stay.

## I.

In 1984 Segal sold an apartment building she owned in New York. In the late summer or early fall of that year, Segal discussed with her friend Gerald Goodman, Len Goodman's father, her desire to shelter the income, for tax purposes, from the sale of the building. Shortly thereafter, Gerald Goodman introduced Segal and Goodman in the hope that Goodman could advise Segal on how to reduce her tax burden.

At Segal's behest, but without any promise of compensation or remuneration, Goodman acquired materials on various tax shelters, which he presented to Segal. When Segal expressed interest in a brochure shown to her by Goodman for a particular tax shelter, the Schultz Individual Cattle Feeding Program ("the Program") offered by Schultz Cattle Company, Incorporated ("SCCI"), Goodman contacted SCCI for further information. He then met with Segal and gave her information on what the representatives of SCCI had said about the Program and how it could be used as a tax deferral plan. Segal eventually decided to invest in the Program and in December 1984 completed all the documents necessary for her investment.

As a participant in the Program, Segal entered into a contract with the Schultz Feedyard and SCCI for purchasing, boarding, and feeding five hundred head of cattle, and another contract requiring SCCI to provide consulting services on future purchases and sale of cattle and on "hedging" practices appropriate in the cattle feeding industry. Segal agreed to pay SCCI for consulting services at the rate of $25.00 per head of cattle purchased, thereby incurring expenses in 1984 that could be used to offset her tax liability in that year. Funding for the Program was supplied by Segal's $20,000 initial payment and a revolving recourse note in the amount of $400,000 arranged by SCCI and funded by the Anadarko Bank and Trust Company ("Anadarko") of Anadarko, Oklahoma. The recourse note was collateralized by a $70,000 letter of credit from Banquest/First National Bank of Santa Fe, New Mexico ("Banquest").

Goodman introduced Segal to commercial lending officers at Banquest so that she could obtain the letter of credit necessary for her investment in the Program. Goodman helped Segal fill out a financial statement to present to the Banquest officers and then returned with Segal to Banquest a second time to present information he had acquired from SCCI explaining exactly what was needed to effectuate the investment. At the closing near the end of December 1984, Banquest requested that Segal pledge, as collateral for the letter of credit, securities held by her stockbroker in Florida. When the broker expressed reluctance to provide the securities, Goodman interceded and explained the purpose for pledging the securities. The broker then acquiesced in the transaction.

Goodman was Segal's sole contact with SCCI during the course of negotiations in November and December 1984. During that time, Goodman had between four and six phone conversations with SCCI representatives. During the second of these conversations, Goodman was told that he would receive $5.00 per head of cattle sold for any referrals to SCCI's consulting service. Before the closing of Segal's investment in the Program, Goodman entered into a written agreement with SCCI confirming that he would receive a referral fee of $5.00 per head of cattle sold to any investor he referred to SCCI. A few months after Segal contracted to invest in the Program, SCCI paid Goodman $2,500 for the sale to Segal of her interest in five hundred cattle. Goodman testified at trial that he had been concerned that if he were paid by SCCI he would owe them an obligation and that he therefore had encouraged Segal to pay him an hourly fee so that he could advise her "in good conscience."

Segal, however, never provided Goodman any compensation for his services.

The price of slaughter-weight cattle dropped precipitously in 1985, and Segal lost her $20,000 initial investment plus an additional $53,078.43 forwarded to Schultz Feedyard by Anadarko for the loss resulting from the sale of cattle in the Program.

On September 22, 1987, Segal commenced this action against SCCI, Schultz Corporation, Schultz Feedyard, their officers and directors (collectively, "the Schultz defendants"), and Goodman. The complaint alleged violations of the Securities Act of New Mexico, NMSA 1978, §§ 58–13–1 to –46 (Repl.Pamp.1984, repealed by N.M.Laws 1986, ch. 7, §§ 1 to 56, effective July 1, 1986) ("the Securities Act"), violations of the Unfair Practices Act, NMSA 1978, §§ 57–12–1 to –21 (Repl.Pamp.1984), common law fraud, and intentional and negligent misrepresentation. Segal moved for partial summary judgment against all defendants in March 1991, requesting an adjudication that her interest in the Program was a security under the Securities Act, that the sale of the security to her violated the Securities Act, and that Segal was entitled to rescind her contract and recover damages. Partial summary judgment was entered on these grounds in July 1991 against all defendants except Goodman.

The remaining counts against the Schultz defendants, the damages to which Segal might be entitled, and all counts against Goodman were tried to the court in October 1991. At the conclusion of the trial, the court found that Goodman had acted as a salesman and agent for a seller of an unregistered security and as an unregistered investment adviser in violation of Sections 58–13–42 and 58–13–23 of the Securities Act. The court also found that Goodman had been negligent and that his negligence was a proximate cause of the damage caused to Segal. In the court's judgment, entered December 4, 1991, Segal was awarded damages against Goodman for $73,078.43, plus prejudgment interest, costs, and attorney's fees. Judgment was also entered against the Schultz defendants

for violations of the Securities Act, the Unfair Practices Act, common law fraud, and misrepresentation in the amount of $219,235.39 (representing treble damages under Section 57–12–10(B) of the Unfair Practices Act for willful participation in unconscionable trade practices), plus prejudgment interest, costs, and attorney's fees.

After announcing its findings from the bench, the court requested the parties to file memoranda on the court's power to stay execution of the judgment. On December 10, 1991, Goodman filed a motion for new trial, for relief from judgment, to alter or amend the judgment, and for a stay of enforcement of the judgment. A hearing was held on these motions on January 7, 1992. The trial court issued an order denying the motions for a new trial and for relief from judgment on January 22, but issued a second order on that date granting Goodman's motion for a stay of enforcement. Goodman filed his notice of appeal from the judgment on February 14, 1992.

As ordered, the stay of enforcement was effective for a period of six months, in order to permit Segal to attempt to collect the judgment from the Schultz defendants. The order of stay provided that Goodman could petition for an extension of the stay after the initial six-month period had expired. The order stated that should Segal show at that time that she had made a good-faith effort to collect the judgment from the Schultz defendants, no further stay of enforcement would be granted. Goodman was not required, as a condition of the stay, to post a bond or any other security to ensure enforcement of the judgment. Segal filed a motion in this Court on March 2, 1992, to vacate or modify the stay; the motion was denied on April 29, 1992.

The court's grant of stay expired on July 7, 1992. On August 20, 1992, the court heard a motion by Goodman to extend the stay. The court ruled on September 30, 1992, that Goodman was to submit to a deposition to aid the court in determining whether to terminate or continue the stay, by establishing, inter alia, whether Good-

man had concealed or transferred assets, and ordered that the stay was to continue until further order of the court.

Goodman seeks to reverse the trial court's judgment, arguing that there is no substantial evidence to support the court's findings that: (1) Goodman was a salesman or agent of SCCI; (2) Goodman was an unregistered investment adviser; and (3) Goodman was negligent and his negligence proximately caused Segal's damages. We find it necessary to decide only the first issue in disposing of Goodman's appeal.

Segal cross-appeals, seeking to set aside the stay of enforcement of the judgment. Segal asserts that the court abused its discretion in granting the stay absent a showing by Goodman of objective factors providing a factual basis for the stay, and erred as a matter of law in granting the stay without requiring a bond or other security for payment of the judgment.

## II.

■ We first address the issue of whether Goodman acted as a salesman or agent of SCCI in the sale of an unregistered security. We believe that the determination of Goodman's status as a salesman or agent is a question of fact. As we have said countless times, facts found by the trial court will not be disturbed by an appellate court if those factual findings are supported by substantial evidence, *e.g.,* *Getz v. Equitable Life Assurance Society,* 90 N.M. 195, 198, 561 P.2d 468, 471, *cert. denied,* 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977)—that is, such evidence as a reasonable mind might accept as adequate support for a conclusion, *e.g., Ortega v. Montoya,* 97 N.M. 159, 161, 637 P.2d 841, 843 (1981). And, of course, "[w]e resolve disputed facts in favor of the party prevailing below, indulging all reasonable inferences in favor of the verdict and disregarding contrary inferences, and we do not independently weigh conflicting evidence." *Smith v. FDC Corp.,* 109 N.M. 514, 519, 787 P.2d 433, 438 (1990).

These statements are not mere slogans, to be mouthed by an appellate court whenever it wants to affirm but has no other reason for doing so. They relate importantly to the allocation of function between a trial court and an appellate court in resolving a dispute such as this one. The trial court determines the facts; the appellate court decides questions of law. *See, e.g., Mascarenas v. Jaramillo,* 111 N.M. 410, 412, 806 P.2d 59, 61 (1991) (trier of facts weighs testimony, determines credibility of witnesses, reconciles inconsistent or contradictory testimony, and decides where truth lies); *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 510, 817 P.2d 238, 244 (1991) (appellate court need not defer to trial court's conclusions of law and may reach conclusion different from trial court's).

■ Goodman entreats us to set aside the court's judgment as not resting on substantial evidence. He claims that his only role in the transaction was assisting his father and his father's girlfriend in helping her find a suitable tax shelter for her income from the sale of the New York apartment building. At bottom, his plea boils down to the contention that it is simply unfair to impose on him the financial consequences, in excess of $100,000, of Segal's unfortunate investment, when he was not in the business of effecting sales for SCCI or anyone else and was only attempting to help Segal and his father find a tax shelter on this one occasion.

As for fairness in an overall perspective, the legislature decreed in Section 58–13–42 that "[t]he person making such sale or contract for sale [of an unregistered security], and every director, officer, salesman or agent of or for such seller who participated or aided in any way in making such sale, shall be jointly and severally liable to such purchaser in any action at law in any court." "Salesman" and "agent" were each defined as "any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect sales of securities...." Section 58–13–2(G). The legislature, in other words, declared in a general sense what is "fair" in connection with a decision on where the loss should fall in a transaction involving an unregistered security.

Insofar as fairness in the particular circumstances of this case is concerned, the trial court determined that it was fairer for Goodman—an individual with considerable financial experience and one who had previously acted as a broker and consultant in the sale of businesses—to bear the loss, rather than Segal—a person who Goodman himself acknowledged was completely inexperienced and unsophisticated in financial affairs. In discharging our function as an appellate court, we cannot say that this determination was unsupported by substantial evidence.

As an appellate court, we *can* point out that under state and federal securities laws it seems to be generally accepted that an agent or representative of a seller of an unregistered security can be held liable to the purchaser even if the agent participates in effecting only one such transaction. *See, e.g., Scheve v. Clark,* 596 F.Supp. 592 (E.D.Mo.1984); *Quick v. Woody,* 295 Ark. 168, 747 S.W.2d 108 (1988). Likewise, there is considerable authority for the proposition that one who participates in or facilitates a transaction in an unregistered security, provided he or she meets the statutory definition of a seller's "agent," can be held liable to the purchaser, even though the agent may also be acting on behalf of the purchaser. *See, e.g., Treider v. Doherty,* 86 N.M. 735, 737, 527 P.2d 498, 500 (Ct.App.) (broker liable under Securities Act whether acting as agent for seller or in a dual capacity for both parties), *cert. denied,* 86 N.M. 730, 527 P.2d 493 (1974); *see also Lawler v. Gilliam,* 569 F.2d 1283, 1288 (4th Cir.1978); *Cady v. Murphy,* 113 F.2d 988, 991 (1st Cir.), *cert. denied,* 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940).

In finding that Goodman was a salesman or agent of SCCI, the court considered evidence that Goodman had introduced Segal to the Program and that Goodman had been Segal's sole contact with SCCI during the course of their negotiations. The evidence showed that Goodman facilitated Segal's investment with SCCI by helping her obtain and complete the necessary documentation, as well as by aiding her attempts to arrange financing for her participation in the Program. Of critical importance, there was evidence that Goodman had signed an agreement with SCCI to receive compensation for referrals to the Program and that he did in fact receive $2,500 for referring Segal. Finally, Goodman testified that he had been concerned that his remuneration by SCCI obligated him to represent the interests of SCCI instead of the interests of Segal.

We thus hold that there is substantial evidence in the record to support the trial court's finding that Goodman was a salesman or agent of SCCI. Therefore, we need not address whether he was an investment adviser or whether he was negligent.

### III.

The more interesting and potentially more significant issue in this case arises in connection with Segal's cross-appeal, in which she contends that the trial court abused its discretion in granting Goodman a stay of enforcement of the judgment. Segal initially asserts that the court failed to consider any objective factors that would have established a factual basis for the stay and then argues that the court erred as a matter of law in granting a stay without requiring a bond or other security for payment of the judgment. We discuss these issues together, in the general context of the trial court's authority to issue a stay of enforcement of a judgment.

Ordinarily, execution of a judgment issues as a matter of course following its entry. SCRA 1986, 1-062(A) (Repl.Pamp.1992); NMSA 1978, § 39-1-4 (Repl.Pamp.1991).[1] We note, however, that this Court has construed NMSA 1978, Section 39-3-22 (Repl.Pamp.1991),[2] as in effect

---

1. Rule 1-062(A) provides in part: "Except as stated herein, execution may issue upon a judgment and proceedings may be taken for its enforcement upon the entry thereof unless otherwise ordered by the court."

Section 39-1-4 reads: "Judgment shall be entered and execution may be issued thereon unless a motion for a new trial is made within the time provided by law, and granted or continued during the term at which the case is tried."

2. Section 39-3-22(A) provides in part:

creating an automatic sixty-day stay of execution pending perfection of appeal. *See Devlin v. State ex rel. New Mexico State Police Dep't*, 108 N.M. 72, 75, 766 P.2d 916, 919 (1988). It may be appropriate for the trial court to delay its decision on an application for a stay of execution until near the expiration of this sixty-day period to see if an appeal has been or is going to be taken. We say this because once an appeal has been taken from a money judgment, a stay of execution of the judgment generally must be conditioned upon the filing of an appropriate bond. Rule 1–062(D);[3] Section 39–3–22(A); *Quintana v. Knowles*, 113 N.M. 382, 383, 827 P.2d 97, 98 (1992). The purpose of the bond is to provide

> a means of compensating an appellee, upon an affirmance, for damages suffered between the entry of judgment and its affirmance that would not have been suffered but for the appeal. In addition, the bond enables the appellee to recover the amount to which the appellee is entitled without filing another lawsuit.

*Quintana*, 113 N.M. at 383, 827 P.2d at 98.

Under certain circumstances, the requirement of a bond for a stay pending appeal is dispensed with. For example, NMSA 1978, Section 39–3–23 (Repl.Pamp.1991), declares that when the appellant is the state, a county, or a municipal corporation, the taking of an appeal operates to stay execution of the judgment without a bond. Another exception was found by this Court in *In re Forfeiture of Two Thousand Seven Hundred Thirty Dollars and No Cents ($2,730.00) in Cash*, 111 N.M. 746, 749–50, 809 P.2d 1274, 1277–78 (1991), in which we held that an indigent litigant's failure to post a supersedeas bond in a forfeiture action does not extinguish his or her right to a stay pending appeal.

■ We disagree with Segal's contention that a supersedeas bond is mandatory in all cases before a stay of execution on a money judgment can be granted. If an appeal is taken, the appellant must post a proper bond before receiving a stay, except as noted above. When an appeal is perfected and a supersedeas bond is posted as required by Rule 1–062(D), stay of enforcement of the judgment pending review is a matter of right. *See American Mfrs. Mut. Ins. Co. v. American Broadcasting–Paramount Theaters, Inc.*, 87 S.Ct. 1, 3, 17 L.Ed.2d 37 (1966); 7 James W. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 62.06 (2d ed. 1992) (discussing Fed.R.Civ.P. 62(d)). Neither this Court's Rules of Appellate Procedure nor this state's statutes, however, impose any requirement for security when an application for a stay of execution is made and there has been no notice of appeal or motion to vacate.

In some circumstances, when necessary to promote the interests of justice, the trial court may order a stay of execution of its judgment, even when that decision is not under review. Rule 1–062(A) provides: "Except as stated herein, execution may issue upon a judgment and proceedings may be taken for its enforcement upon entry thereof *unless otherwise ordered by the court*." (Emphasis added.) We read Rule 1–062(A) as an affirmation of the trial court's inherent power to stay execution of a judgment temporarily in order to prevent injustice. *See Goodlatte v. Liberty Mut. Ins. Co.*, 27 Conn.Supp. 382, 239 A.2d 546, 548 (1967) ("While a court ordinarily will not interfere with the right of a judgment creditor to collect his debt, courts have a general supervising control over the processes of execution, and for the purpose of preventing injustice, an execution is within

There shall be no supersedeas or stay of execution upon any final judgment or decision of the district court in any civil action *in which an appeal has been taken* ... unless the appellant ... within sixty days from the entry of judgment or decision, executes a bond to the adverse party in double the amount of the judgment complained of, with sufficient sureties, and approved by the clerk of the district court....

(Emphasis added.)

**3.** Rule 1–062(D) provides in part: "When an appeal is taken, the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in Paragraphs A and C of this rule.... The stay is effective when the supersedeas bond is approved by the district court."

the inherent, equitable control of the court."); 33 C.J.S. *Executions* § 139(b)(1) ("[A]ll courts of law, under statutes or under their general supervisory powers over their process, have the power temporarily to stay execution on judgments by them rendered whenever it is necessary to accomplish the ends of justice."). Subsumed within the trial court's discretionary authority to issue a stay of execution of a judgment when the judgment itself has not been challenged by appeal is the authority, should a party apply for a stay of execution without taking an appeal, to grant a stay even in the absence of the party's posting a supersedeas bond.[4]

Federal courts have recognized that, under certain limited circumstances, it may be appropriate to grant a stay of execution on a money judgment in the absence of a supersedeas bond. Factors the courts consider in determining whether to waive the bond include the complexity of the collection process, the apparent ability of the defendant to pay the judgment, the court's confidence that funds will be available to satisfy the judgment, and whether other creditors of the defendant will be adversely affected by the requirement that a bond be posted. *See Dillon v. Chicago*, 866 F.2d 902, 904–05 (7th Cir.1988). We commend these factors, as a nonexclusive list, to the trial court in the present case—and to any other trial court in similar circumstances—for consideration on remand, along with the other factors mentioned in this opinion.

■ Segal suggests that the trial court should be required to address a set of objective factors—such as those established in *Tenneco Oil Co. v. New Mexico Water Quality Control Commission*, 105 N.M. 708, 736 P.2d 986 (Ct.App.1986), for the exercise of discretion in granting or denying a stay from an order or regulation of administrative agency[5]—in assessing the propriety of a stay of execution of a money judgment. Although parts of the *Tenneco* test may be helpful in evaluating requests to stay execution of money judgments, we choose to rely instead on a more flexible balancing of the parties' respective interests. To properly evaluate requests for stays of execution of money judgments, the court must consider the circumstances of each individual case, *see Alpers v. Alpers*, 111 N.M. 467, 469, 806 P.2d 1057, 1059 (Ct.App.1990); and this entails a weighing of the interests of the judgment creditor and the judgment debtor. *See, e.g., Landis v. North American Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936); *Kronz v. Kronz*, 393 Pa.Super. 227, 574 A.2d 91, 94 (1990).

■ The trial court found that Goodman's relative lack of culpability in causing Segal's losses outweighed Segal's interest in prompt execution of her judgment and ordered a stay of execution for six months while Segal sought to collect her judgment from the more culpable parties, the Schultz defendants. Under similar facts, this Court might weigh the parties' interests differently. The issue before us, however, is whether the trial court abused its discretion in ordering the stay. That is, did the court choose a course of action that no reasonable person would select? *See Ro-*

---

**4.** However, the willingness and ability of the applicant for a stay to post a supersedeas bond are important factors for the court to consider in exercising its discretion in deciding whether to grant or deny the application. *See infra* note 7.

**5.** The *Tenneco* test involves consideration of whether there has been a showing of: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting a stay. *Tenneco Oil*, 105 N.M. at 710, 736 P.2d at 988. This test, first articulated in *Virginia*

*Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958), has been widely used for evaluating motions to grant preliminary injunctions or to stay court and administrative orders. *See e.g., Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir.1987); *Arthur Guinness & Sons v. Sterling Publishing Co.*, 732 F.2d 1095, 1099 (2d Cir.1984); *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977); *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir.1970), *aff'd sub nom. Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Associated Sec. Corp. v. SEC*, 283 F.2d 773, 774–75 (10th Cir.1960).

*selli v. Rio Communities Serv. Station, Inc.*, 109 N.M. 509, 512, 787 P.2d 428, 431 (1990) ("A trial court abuses its discretion when its decision is contrary to logic and reason." [6]) If the trial court did not act unreasonably in granting the stay, then we should affirm, even if the court reached a decision that one or more of the members of this Court would not ourselves have reached.

We find no abuse of discretion by the trial court in granting a stay of execution of judgment to Goodman for a period of six months while Segal sought recovery from the Schultz defendants to satisfy her judgment. Though the grant of stay did not require Goodman to post a bond or other security, a supersedeas bond is not mandatory where there is no appeal pending at the time the stay is granted. The desirability of protecting the interests of the judgment creditor by means of a bond is simply a factor for the court to consider in its balancing, albeit an important—in some cases a *very* important—factor.[7] The court reasonably found that the equities in the balance were in Goodman's favor, and we therefore affirm the order of January 22, 1992, granting Goodman a stay of execution of judgment.

### IV.

Pursuant to SCRA 1986, 12–209(D) (Repl.Pamp.1992), we have obtained the trial court's order of September 30, 1992, requiring Goodman to be deposed so that the court could determine whether to terminate or extend the stay. We note that although the deposition was taken and filed with the court on November 4, 1992, the stay remains in place—over a year after Segal's award of judgment. It is obvious that the stay, though proper initially, cannot operate indefinitely.

As a matter of law, a stay of execution of a money judgment should not be indefinite in duration. An indefinite stay destroys the rights of the judgment creditor and may not properly be contemplated as part of the balancing process. *See United States v. Denver & Rio Grande W.R.R.*, 223 F.2d 126, 127 (10th Cir.1955) (holding that neither the Federal Rules of Civil Procedure nor the Utah Rules of Civil Procedure authorize the permanent suspension of a final judgment); *Taylor Nat'l, Inc. v. Jensen Bros. Constr. Co.*, 641 P.2d 150, 154 (Utah 1982) (Utah Rule of Civil Procedure 62(a) does not permit indefinite stay of execution of judgment); *Cutler Assoc., Inc. v. Merrill Trust Co.*, 395 A.2d 453, 456 (Me.1978) (trial court may only stay execution of its judgment temporarily). At some point a stay of lengthy duration will unreasonably impair the interests of the judgment creditor. We are content to leave determination of that point to the discretion of the trial court—subject to review for possible abuse—since we are confident that the trial court, being aware of all the facts, will in the majority of cases reach a fair, just, and common-sense result consistent with the court's duty to cause its

---

**6.** We read "contrary to logic" and "contrary to reason" as synonymous—*i.e.,* as synonymous with "unreasonable." *See also Wolf & Klar Cos. v. Garner,* 101 N.M. 116, 118, 679 P.2d 258, 260 (1984) ("exceed[ing] the bounds of reason"); *Zamora v. CDK Contracting Co.,* 106 N.M. 309, 314, 742 P.2d 521, 526 (Ct.App.) ("against the logic and effect of the facts and circumstances"), *cert. quashed,* 106 N.M. 353, 742 P.2d 1058 (1987). These latter formulations too are synonymous with "unreasonable."

**7.** In this connection, we note that:

A judgment creditor holds a general, unsecured debt. It is different from other unsecured debt only to the extent the judgment creditor also has a right to immediate execution [although, if the judgment debtor owns real property, the creditor can obtain a lien on the property by recording a transcript of the judgment]. The function of a supersedeas bond is to protect the judgment creditor's position from erosion ... that could occur if the [debtor's] financial position takes a turn for the worse or the [debtor] puts assets beyond the [creditor's] reach.... [During the pendency of the stay,] the judgment creditor's claim may slip behind the claims of other creditors.

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 786 F.2d 794, 800 (7th Cir.1986) (Easterbrook, J., concurring). Thus, properly balancing the rights of the judgment creditor and judgment debtor might require a bond or other security to protect the position of the judgment creditor from possible deterioration or even elimination.

judgment to be carried into effect. *See* NMSA 1978, § 39–1–5 (Repl.Pamp.1991) ("It shall be the duty of the judge of any court to cause judgment, sentence or decree of the court to be carried into effect, according to law.").

We affirm the trial court's decisions awarding Segal judgment against Goodman and staying enforcement of that judgment. We remand the case to the trial court for reevaluation of the current stay consistently with this opinion, with instructions to consider whether the stay has now served its purpose and should be lifted or, at the least, whether a supersedeas bond should be required if the stay is to remain in effect.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.