David BRISTOW and Cliff Ferren  *v.*
Randy MOUROT

CA 06-1419                                          260 S.W.3d 733

Court of Appeals of Arkansas
Opinion delivered August 29, 2007

*Dover Dixon Horne, PLLC*, by: *Thomas S. Stone* and *Nona M. Robinson*, for appellants.

*Friday, Eldredge & Clark, LLP*, by: *Kevin A. Crass* and *Jamie Huffman Jones*, for appellee Randall Mourot.

Dᴀᴠɪᴅ M. Gʟᴏᴠᴇʀ, Judge. The trial court, sitting as fact-finder, ruled that appellee Randy Mourot did not violate the Arkansas Securities Act and therefore owed no damages to appellants. We affirm.[1]

In 1997, Mourot decided to sell his company, Mail Contractors of America. He asked several members of his management team, including appellants, to assist him with presentations for prospective buyers. In return, he promised them a "transaction bonus" equivalent to a year's salary when the company sold.

After several presentations were made, Mourot decided to sell to Code, Hennessey, & Simmons, a Chicago company. He told his managers that Code Hennessey wanted to maintain continuity of management and that key management personnel would have the opportunity to invest in the company. In early 1998, representatives from Code Hennessey came to Arkansas to discuss the investment opportunity. Attendees, including appellants, were informed that they could invest in a holding company, Contract Mail Holding, Inc. (CMH) and that they could obtain personal loans from CMH. Code Hennessey representatives answered questions about the investment and, although Mourot attended the meeting, he did not say much, according to appellant Ferren.

After the meeting, Mourot wrote a memo to his managers and addressed them as "Potential Equity Investors." The memo stated that he had asked attorney Paul Bishop, who was representing him in the sale of the company, to review the investment and loan documents on the managers' behalf, although the managers were free to have their personal attorneys review the documents. The memo also addressed a tax question and a loan question regarding the managers' investments; answered two questions about the managers' transaction bonuses; and stated the following:

> I need to know your plans for investing by the end of this week or sooner if you can. I need to know:
>
> — Dollar amount of investment
>
> — Loan Amount (max of 50% of investment amount)

---

[1] This case was previously dismissed for lack of an appealable order. *Bristow v. Mourot*, CA06-153 (Oct. 4, 2006) (not designated for publication). Appellants have now obtained a final order, giving us jurisdiction to address the merits.

— Actual name investment to be held in (for example mine: Randall G. Mourot)

— Whether to withhold 401(k) percentage from transaction bonus or not

— Amount to be withheld for Federal and State taxes

Appellants provided this information to Mourot, who said he passed it along to Bishop.

After the memo was written, appellants and other members of the management team met with attorney Bishop. There is no indication that Mourot was present at this meeting. Bishop informed the managers of the minimum terms they could expect to receive for their investments, and he promised to try to negotiate better terms from Code Hennessey. As a result of those negotiations, appellant Bristow agreed to invest $75,000 in CMH, and appellant Ferren agreed to invest $40,000. They planned to use their transaction bonuses from Mourot to pay for most if not all of their investments. However, because they would not obtain those bonuses until the sale closed, Mourot agreed to provide them with short-term loans. Therefore, appellants made their investment checks out to Mourot, who purchased the CMH stock for them.

After the sale closed on March 20, 1998, appellants were employed by CMH and apparently made additional investments in the company. However, they were fired in 2000. When they inquired about the return of their investments, CMH sent a check for $18,567.29 to Bristow and $955 to Ferren, despite the fact that Bristow had invested $123,756 and Ferren $93,643.24. As a result, appellants sued CMH for violating the Arkansas Securities Act.[2] They also sued Mourot, claiming that he acted as CMH's agent in selling the investments. CMH consented to judgment in the above amounts, but the case against Mourot went to trial. The sole issue was whether he was liable under the Arkansas Securities Act as an agent who materially aided in the sale of the investments. The circuit judge, after hearing testimony and receiving trial briefs, entered judgment in favor of Mourot. Appellants now appeal from that ruling.

Our standard of review is well established. In an appeal from a bench trial, we do not reverse unless the trial court's finding is clearly erroneous. *First Nat'l Bank v. Garner*, 86 Ark. App. 213, 167

---

[2] Other causes of action were pled but dismissed.

S.W.3d 664 (2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

Generally, with exceptions not applicable here, an agent who materially aids in the sale of a security is jointly and severally liable with, and to the same extent as, the seller. Ark. Code Ann. § 23-42-106(c) (Repl. 2000). An "agent," for our purposes, is any individual who represents a securities issuer in effecting or attempting to effect the sale of securities. Ark. Code Ann. § 23-42-102(1)(A) (Supp. 2005).[3] The question of whether a representative materially aids in the sale of a security is one of fact, the resolution of which depends, to some extent, on inferences drawn from the testimony. *See Hogg v. Jerry*, 299 Ark. 283, 773 S.W.2d 84 (1989).

Appellants contend that several aspects of Mourot's behavior constitute "overwhelming evidence" that he acted as an agent for CMH and materially aided in the sale of CMH securities. Some of the activities that they attribute to Mourot include: 1) aiding in arranging a meeting of potential investors and selecting potential investors; 2) answering questions about the investments and asking potential investors to inform him about their decision to invest; 3) providing the potential investors with an attorney; 4) facilitating the investments by use of the transaction bonus; 5) having a strong incentive to facilitate the investments in order to close his sale of the company.

■ Under the facts of this case, we are not left with a definite and firm conviction that the trial court erred. While Mourot undisputedly passed along information to appellants and answered questions about their investments, he denied that he was acting on behalf of CMH, and he testified that his actions were taken because appellants and the other investors were his friends and employees. Further, while Mourot informed his managers that they would have the opportunity to invest in CMH and that Code Hennessey was "coming down" for the investment meeting, there is no proof that Mourot actively participated in the meeting. *See Titan Oil & Gas Co. v. Shipley*, 257 Ark. 278, 517 S.W.2d 210 (1974) (affirming the trial court's finding that a person who provided an investor with a prospectus and attended an investors'

---

[3] We have cited to the most recent versions of these statutes, but they are the same in all relevant respects as they were in 1997-98 when the sales in this case were taking place.

meeting but did not participate was not liable as an agent for the issuer). Likewise, Mourot's answering questions about the investments, gathering information, and offering the services of his attorney can be attributed, as he testified, to his close business and personal relationship with his managers rather than an agency relationship with CMH. Moreover, there is no direct evidence that Code Hennessey or CMH had asked Mourot to act on their behalf or that Mourot received any direct compensation from CMH for acquiring or encouraging the investors.[4] In fact, Mourot testified that he and his managers were friends and "a close-knit group" and that he was engaged in "contentious negotiations" with CMH up to the time of closing, lending credence to the idea that he was not acting on CMH's behalf.

■ As for appellants' claim that Mourot "chose" the investors, the evidence is in conflict on that point. The investors' booklet stated that CMH would offer securities to members of senior management "selected by Randall Mourot . . . and [Code Hennessey]." However, Mourot said his task was merely to identify his managers to Code Hennessey. Conflicts in testimony are to be resolved by the trier of fact. *McNamara v. Bohn*, 69 Ark. App. 337, 13 S.W.3d 185 (2000).

■ Finally, even though Mourot facilitated appellants' investment by use of the transaction bonuses, it is undisputed that he did not earmark the transaction bonuses for use as an investment in CMH. The bonuses were promised before Code Hennessey was selected as a buyer, and Mourot testified that the bonuses could be used as the recipient wished. Later, when the investors decided to use their bonuses to invest in CMH, a timing problem arose because they would not receive their bonus until the sale closed. There was evidence that Mourot and attorney Bishop came up with the idea to make a short-term "handshake" loan to the investors to allow them to make their investments. As before, it could reasonably be inferred that Mourot was acting in his own interest and in the interest of his managers but not necessarily as a representative of CMH.

---

[4] This distinguishes the present case from *Segal v. Goodman*, 115 N.M. 349, 851 P.2d 471 (1993), and *Boland v. Hammond*, 144 Ohio App. 3d 89, 759 N.E.2d 789 (2001), cited by appellants.

Appellants rely on *Quick v. Woody*, 295 Ark. 168, 747 S.W.2d 108 (1988), and *Hogg v. Jerry*, *supra*, for their claim that Mourot was an agent of CMH. In *Quick*, Gary Quick began offering securities for sale. His mother, Hazel Quick, participated in a promotional meeting by making comments about what to expect from the investment, and she asked potential investors at the meeting to let her and Gary know of others that might be interested. Hazel also made a similar comment while handing out a business card with her name on it. Further, Hazel encouraged another person to invest and provided her with a prospectus containing the statement "remit to Hazel Quick." Hazel accepted a check from another investor and indicated to him that she was handling Gary's interests in Arkansas. The trial court found that Hazel was an agent who materially aided in the sale of securities and, on appeal, our supreme court affirmed, ruling that the trial court's finding was not clearly erroneous.

In *Hogg*, the trial court ruled that Nolan Haines was an agent who materially aided in a securities sale. The supreme court affirmed, stating that Haines "admitted" in his deposition that he materially aided in the sale and that he "helped to get" one investor. There was also evidence that Haines provided the investor with a prospectus and promoted the investor's participation in the venture.

The outcomes in *Quick* and *Hogg* do not require reversal here. First of all, in those cases, our supreme court affirmed the trial courts' findings. The supreme court did not state that, as a matter of law, the activities in those cases amounted to materially aiding in the sale of securities but held that the trial court's ruling, based on those activities, could not be said to be clearly erroneous. Moreover, we do not believe that Mourot's conduct in this case rose to the level of overt promotion engaged in by Hazel Quick and Nolan Haines. Unlike the defendants in those cases, Mourot's actions could be viewed as an attempt to help his employees and investors rather than "representing" CMH.

For these reasons, we affirm the trial court's ruling.

Affirmed.

ROBBINS and BAKER, JJ., agree.