911 P.2d 861

**William G. HILL, III, Derek Head, Charlene Leamons, and Bernard Dueto, Plaintiffs–Appellees,**

v.

**The COMMUNITY OF DAMIEN OF MOLOKAI, Defendant–Appellant.**

**No. 21715.**

Supreme Court of New Mexico.

Jan. 9, 1996.

Rehearing Denied Feb. 9, 1996.

Protection and Advocacy System, Nancy Koenigsberg, Albuquerque, for Appellant.

William J. Darling & Associates, P.A., William J. Darling, Margaret P. Armijo, Albuquerque, Sylvain Segal, Albuquerque, for Appellees.

Michael B. Browde, Albuquerque, Singer, Smith & Williams, Nan E. Burke, Albuquerque, for Amici Curiae ACLU, et al.

## OPINION

FROST, Justice.

1. Defendant–Appellant Community of Damien of Molokai (Community) appeals from the district court's ruling in favor of Plaintiffs–Appellees, enjoining the further use of the property at 716 Rio Arriba, S.E., Albuquerque, as a group home for individuals with AIDS. Plaintiffs–Appellees argue that the group home violates a restrictive covenant. The Community contends that the group home is a permitted use under the covenant and, alternatively, that enforcing the restrictive covenant against the group home would violate the Federal Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1988) [hereinafter FHA]. We note jurisdiction under SCRA 1986, 12–102(A)(1) (Repl.Pamp.1992), and reverse.

## I. FACTS

2. The underlying facts of this case are not in dispute. The Community is a private, nonprofit corporation which provides homes to people with AIDS[1] as well as other termi-

---

1. We use the term "AIDS" throughout this opinion because the Community's briefs indicate that the current residents in the group home all suffer from Acquired Immune Deficiency Syndrome. However, our discussion regarding people with AIDS has equal application for people who test

nal illnesses. In December 1992 the Community leased the residence at 716 Rio Arriba, S.E., Albuquerque, located in a planned subdivision called Four Hills Village, for use as a group home for four individuals with AIDS. The four residents who subsequently moved into the Community's group home were unrelated, and each required some degree of in-home nursing care.

3. Plaintiffs–Appellees, William Hill, III, Derek Head, Charlene Leamons, and Bernard Dueto (hereinafter Neighbors) live in Four Hills Village on the same dead-end street as the group home. Shortly after the group home opened, the Neighbors noticed an increase in traffic on Rio Arriba street, going to and from the group home. The Neighbors believed that the Community's use of its house as a group home for people with AIDS violated one of the restrictive covenants applicable to all the homes in the sixteenth installment of Four Hills Village. Installment sixteen encompasses the Community's group home and the Neighbors' houses. The applicable covenant provides in relevant part:

### 2. USE OF LAND

No lot shall ever be used for any purpose other than *single family residence purposes*. No dwelling house located thereon shall ever be used for other than *single family residence purposes*, nor shall any outbuildings or structure located thereon be used in a manner other than incidental to such *family residence purposes*. The erection or maintenance or use of any building, or the use of any lot for other purposes, including, but not restricted to such examples as stores, shops, flats, duplex houses, apartment houses, rooming houses, tourist courts, schools, churches, hospitals, and filling stations is hereby expressly prohibited.

Reservations, Covenants and Restrictions, Four Hills Village (Sixteenth Installment) (filed in the Bernalillo County Clerk's Office, Apr. 5, 1973) (emphasis added). The Neighbors specifically argue that the term "single

family residence" does not include group homes in which unrelated people live together.

4. On August 12, 1993, the Neighbors filed for an injunction to enforce the covenant and to prevent further use of the Community's house as a group home. The Community defended on the grounds that the covenant did not prohibit the group home and, in the alternative, that enforcement of the covenant would violate the FHA. The Community also counterclaimed to permanently enjoin enforcement of the covenant and to recover attorney's fees. After hearing evidence at two separate hearings, the trial court held that the restrictive covenant prevented the use of the Community's house as a group home for people with AIDS and issued a permanent injunction against the Community. The trial court entered specific findings that the Community's use of the home generated a significant number of vehicle trips up and down the street and that the increased traffic had detrimentally altered the character of the neighborhood.

5. The Community appealed the trial court's order, and we granted a stay of the permanent injunction pending this appeal. We now review, first, the Community's claims regarding the proper interpretation of the restrictive covenant, and second, the applicability of the FHA.

### II. FOUR HILLS RESTRICTIVE COVENANTS

■■■ 6. The first issue before us is the applicability of the Four Hills restrictive covenant to the Community's group home. As this Court noted in *Cain v. Powers*, 100 N.M. 184, 186, 668 P.2d 300, 302 (1983), in determining whether to enforce a restrictive covenant, we are guided by certain general rules of construction. First, if the language is unclear or ambiguous, we will resolve the restrictive covenant in favor of the free enjoyment of the property and against restrictions. Second, we will not read restrictions on the use and enjoyment of the land into the

positive for the human immunodeficiency virus (HIV-positive), which causes AIDS. For a thorough discussion of HIV and its relation to AIDS,

*see Baxter v. City of Belleville*, 720 F.Supp. 720, 724–26 (S.D.Ill.1989).

covenant by implication. Third, we must interpret the covenant reasonably, but strictly, so as not to create an illogical, unnatural, or strained construction. Fourth, we must give words in the restrictive covenant their ordinary and intended meaning. *Id.; see also Wilcox v. Timberon Protective Ass'n,* 111 N.M. 478, 483, 806 P.2d 1068, 1073 (Ct. App.1990) (applying four-part test to restrictive covenant prohibiting mobile homes), *cert. denied,* 111 N.M. 529, 807 P.2d 227 (1991).

## A. Operating a Group Home Constitutes Residential Use

■ 7. At issue here is the proper interpretation of the restriction, "No lot shall ever be used for any purpose other than single family residence purposes." The trial court held that the Community's use of property as a group home for four, unrelated individuals with AIDS violated this restriction. In reaching its conclusion that the group home violated the residential use restriction, the trial court made two specific findings regarding the nature of the current use of the home. The court found that the "Community uses the house … as a non profit hostel for providing services to handicapped individuals" and that the "Community uses of the residence are much closer to the uses commonly associated with health care facilities, apartment houses, and rooming houses than uses which are commonly associated with single family residences." Thus the trial court apparently concluded that the property was being used for commercial purposes rather than residential purposes. However, we find that the trial court's conclusions are incorrect as a matter of law.

8. It is undisputed that the group home is designed to provide the four individuals who live in the house with a traditional family structure, setting, and atmosphere, and that the individuals who reside there use the home much as would any family with a disabled family member. The four residents share communal meals. They provide support for each other socially, emotionally, and financially. They also receive spiritual guidance together from religious leaders who visit them on Tuesday evenings.

9. To provide for their health care needs, the residents contract with a private nursing service for health-care workers. These health-care workers do not reside at the home, and they are not affiliated with the Community in any way. The number of hours of service provided by the health-care workers is determined by a case-management group assigned by the state pursuant to a state program. The in-home health services that the residents receive from the health-care workers are precisely the same services to which any disabled individual would be entitled regardless of whether he or she lived in a group home or alone in a private residence. The health-care workers do most of the cooking and cleaning. The residents do their own shopping unless they are physically unable to leave the home.

10. The Community's role in the group home is to provide oversight and administrative assistance. It organizes the health-care workers' schedules to ensure that a nurse is present twenty-four hours per day, and it provides oversight to ensure that the workers are doing their jobs properly. It also receives donations of food and furniture on behalf of the residents. The Community provides additional assistance for the residents at times when they are unable to perform tasks themselves. A Community worker remains at the house during the afternoon and evening but does not reside at the home. The Community, in turn, collects rent from the residents based on the amount of social security income the residents receive, and it enforces a policy of no drinking or drug use in the home.

11. The Community's activities in providing the group home for the residents do not render the home a nonresidential operation such as a hospice or boarding house. As the South Carolina Supreme Court noted when faced with a similar situation involving a group home for mentally impaired individuals:

> This Court finds persuasive the reasoning of other jurisdictions which have held that the incident necessities of operating a group home such as maintaining records, filing accounting reports, managing, supervising, and providing care for individuals in

exchange for monetary compensation are collateral to the prime purpose and function of a family housekeeping unit. Hence, these activities do not, in and of themselves, change the character of a residence from private to commercial.

*Rhodes v. Palmetto Pathway Homes, Inc.,* 303 S.C. 308, 400 S.E.2d 484, 485–86 (1991). In *Jackson v. Williams,* 714 P.2d 1017, 1022 (Okla.1985), the Oklahoma Supreme Court similarly concluded:

> The essential purpose of the group home is to create a normal family atmosphere dissimilar from that found in traditional institutional care for the mentally handicapped. The operation of a group home is thus distinguishable from a use that is commercial—i.e., a boarding house that provides food and lodging only—or is institutional in character.

*See also Gregory v. State Dep't of Mental Health, Retardation & Hosps.,* 495 A.2d 997, 1001–02 (R.I.1985) (finding the group home to be residential and not commercial in nature, and listing cases from other jurisdictions reaching the same conclusion); *Blevins v. Barry–Lawrence County Ass'n for Retarded Citizens,* 707 S.W.2d 407, 408–09 (Mo. 1986) (en banc) (same, listing jurisdictions). *But see Omega Corp. of Chesterfield v. Malloy,* 228 Va. 12, 319 S.E.2d 728, 732 (1984) (finding group home for mentally disabled constituted a "facility" instead of a family residence in violation of covenant), *cert. denied,* 469 U.S. 1192, 105 S.Ct. 967, 83 L.Ed.2d 971 (1985). We agree with the conclusions reached by the South Carolina Supreme Court and other jurisdictions that the purpose of the group home is to provide the residents with a traditional family structure and atmosphere. Accordingly, we conclude as a matter of law that, given the undisputed facts regarding how the Community operates the group home and regarding the nature of the family life in the home, the home is used for residential purposes in compliance with the restrictive covenant.

**B. Residents of Group Home Meet Single Family Requirement**

 12. The Neighbors also argue on appeal that the four, unrelated residents of the group home do not constitute a "single family" as required by the restrictive covenant. The Neighbors contend that the restrictive covenant should be interpreted such that the term "family" encompasses only individuals related by blood or by law. We disagree.

13. The word "family" is not defined in the restrictive covenant and nothing in the covenant suggests that it was the intent of the framers to limit the term to a discrete family unit comprised only of individuals related by blood or by law. Accordingly, the use of the term "family" in the covenant is ambiguous. As we noted above, we must resolve any ambiguity in the restrictive covenant in favor of the free enjoyment of the property. *Cain,* 100 N.M. at 186, 668 P.2d at 302. This rule of construction therefore militates in favor of a conclusion that the term "family" encompasses a broader group than just related individuals and against restricting the use of the property solely to a traditional nuclear family.

14. In addition, there are several other factors that lead us to define the term "family" as including unrelated individuals. First, the Albuquerque municipal zoning ordinance provides a definition of family that is at odds with the restrictive definition suggested by the Neighbors. The Albuquerque zoning ordinance includes within the definition of the term "family," "[a]ny group of not more than five [unrelated] persons living together in a dwelling." Albuquerque, N.M., Rev. Ordinances, art. XIV, § 7–14–5(B)(41) (1974 & Supp.1991).

 15. The Neighbors argue that the zoning code definition is irrelevant to the scope of the covenant. They point to *Singleterry v. City of Albuquerque,* 96 N.M. 468, 470, 632 P.2d 345, 347 (1981), in which this Court stated, "It is well established that zoning ordinances cannot relieve private property from valid restrictive covenants if the ordinances are less restrictive." However, we agree with the Colorado Court of Appeals which noted, "While [the zoning] statute has no direct applicability to private covenants, it is some indication of the type of groups that might logically, as a matter of public policy, be included within the concept of a single family." *Turner v. United Cere-*

*bral Palsy Ass'n,* 772 P.2d 628, 630 (Colo.Ct. App.1988) (construing term "family" in covenant to include unrelated group home residents), *cert. denied,* (Apr. 24, 1989); *see also Gregory,* 495 A.2d at 1002 n. 3 (referring to zoning ordinances when construing the term "family," as used in covenant). In the present case, we are not using the zoning ordinances to relieve the Community of its obligations under the restrictive covenant. We are instead looking to the definition of family within the zoning ordinance as persuasive evidence for a proper interpretation of the ambiguous term in the covenant. The Albuquerque zoning ordinance would include the residents of the group home within its definition of family.

■■■■ 16. Second, there is a strong public policy in favor of including small group homes within the definition of the term "family." The federal government has expressed a clear policy in favor of removing barriers preventing individuals with physical and mental disabilities from living in group homes in residential settings and against restrictive definitions of "families" that serve to exclude' congregate living arrangements for the disabled. The FHA squarely sets out this important public policy. As the court in *United States v. Scott,* 788 F.Supp. 1555, 1561 n. 5 (D.Kan.1992), stated, "The legislative history of the amended Fair Housing Act reflects the national policy of deinstitutionalizing disabled individuals and integrating them into the mainstream of society." The *Scott* court further noted that the Act "is intended to prohibit special restrictive covenants or other terms or conditions, or denials of service because of an individual's handicap and which ... exclud[e], for example, congregate living arrangements for persons with handicaps." *Id.* at 1561 (alterations in original) (quoting H.R.Rep. No. 711, 100th Cong., 2d Sess. 23–24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2184–85). It "protects against efforts to 'restrict the ability of individuals with handicaps to live in communities.'" *Id.* This policy is applicable to the present case because the FHA's protections for handicapped people extend to individuals with AIDS. *See Support Ministries for Persons with AIDS, Inc. v. Village of Waterford,* 808 F.Supp. 120, 129 (N.D.N.Y.1992) ("The

legislative history of the 1988 amendments to the FHA reveals that Congress intended to include among 'handicapped' persons those who are HIV-positive...."). The Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 6000 (1988 & Supp. II 1990), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 (1988 & Supp. IV 1992), also identify a national policy favoring persons with disabilities living independently in normal communities and opposing barriers to this goal. *See Scott,* 788 F.Supp. at 1561 n. 5.

■■■■ 17. In New Mexico, the Developmental Disabilities Act, NMSA 1978, § 28–16A–2 (Cum.Supp.1995), expresses a clear state policy in favor of integrating disabled individuals into communities. The Act provides in relevant part:

> It is the purpose of the legislature in enacting the Developmental Disabilities Act ... to promote opportunities for all persons with developmental disabilities to live, work and participate with their peers in New Mexico communities. Priority shall be given to the development and implementation of support and services for persons with developmental disabilities that will enable and encourage them to ... achieve their greatest potential for independent and productive living by participating in inclusive community activities; and ... live in their own homes and apartments or in facilities located within their own communities and in contact with other persons living in their communities.

Section 28–16A–2(A). Although this act is directed at assisting individuals with developmental disabilities, such as autism or mental retardation, we find that this important state policy applies with equal force to individuals with any form of disability or handicap.

18. Furthermore, the state grant of zoning authority to municipalities, NMSA 1978, § 3–21–1(C) (Repl.Pamp.1995), expressly provides:

> All state-licensed or state-operated community residences for the mentally ill or developmentally disabled serving ten or fewer persons may be considered a residential use of property for purposes of

zoning and may be permitted use in all districts in which residential uses are permitted generally, including particularly residential zones for single-family dwellings.

Although this section may not necessarily require that municipalities include community residences within single-family residential zones, it clearly indicates a preference for municipalities adopting this inclusionary approach.

19. Both the federal and state governments have expressed a strong policy encouraging locating group homes in single-family residential areas and treating them as if they constituted traditional families. This overwhelming public policy is extremely persuasive in directing us toward an expansive interpretation of the term "family." *See Crane Neck Ass'n v. New York City,* 61 N.Y.2d 154, 472 N.Y.S.2d 901, 904, 460 N.E.2d 1336, 1339 (refusing to enforce restrictive covenant that contravened long-standing public policy favoring the establishment of group homes for the mentally disabled), *cert. denied,* 469 U.S. 804, 105 S.Ct. 60, 83 L.Ed.2d 11 (1984); *Craig v. Bossenbery,* 134 Mich.App. 543, 351 N.W.2d 596, 599 (1984) (noting that strong public policy favoring group homes overrides enforcement even of unambiguous restrictive covenant), *appeal denied,* (Jan. 28, 1986); *cf. Jackson v. Fort Stanton Hosp. & Training Sch.,* 757 F.Supp. 1243, 1312–13 (D.N.M. 1990) (noting importance of community placement for the mentally impaired and identifying shortages of adequate community-based group housing in New Mexico), *rev'd in part on other grounds,* 964 F.2d 980 (10th Cir. 1992).

20. Third, other jurisdictions have consistently held that restrictive covenants mandating single-family residences do not bar group homes in which the occupants live as a family unit. For example the *Williams* court noted, "When ... the restrictive covenant under consideration prohibits occupancy of more than one family unit but does not address itself to the composition of the family, a court is loathe to restrict a family unit to that composed of persons who are related, one to another, by consanguinity or affinity." *Williams,* 714 P.2d at 1023; *see also Welsch*

*v. Goswick,* 130 Cal.App.3d 398, 181 Cal.Rptr. 703, 709–10 (1982) (noting that policy considerations mandate that covenant be interpreted to allow residential care facilities of six or fewer people); *Maull v. Community Living for the Handicapped, Inc.,* 813 S.W.2d 90, 92 (Mo.Ct.App.1991) ("[G]roup homes where the residents function in a family setting, interdependent on one another in carrying out the daily operation and routine of the residence meet the single family requirement of the covenant."), *transfer denied,* (Aug. 8, 1991); *Montana ex rel. Region II Child & Family Servs., Inc. v. District Court,* 187 Mont. 126, 609 P.2d 245, 248 (1980) (holding group home constituted family as required by covenant). *But see Adult Group Properties, Ltd. v. Imler,* 505 N.E.2d 459, 465–67 (Ind.Ct.App.1987) (questionable conclusion that the undefined term "family" in the covenant included only "father, mother and children, immediate blood relatives"), *transfer denied,* (Oct. 15, 1987).

21. Accordingly, we reject the Neighbors' claim that the term "family" in the restrictive covenants should be read to include only individuals related by blood or by law. We agree with the court in *Open Door Alcoholism Program, Inc. v. Board of Adjustment,* 200 N.J.Super. 191, 491 A.2d 17, 21 (App.Div.1985), which noted, "The controlling factor in considering whether a group of unrelated individuals living together as a single housekeeping unit constitutes a family ... is whether the residents bear the generic character of a relatively permanent functioning family unit." As we already discussed above, the individuals living in the Community's group home do operate as a family unit. Much of the activities of the residents are communal in nature. More importantly, the residents provide moral support and guidance for each other and together create an environment that assists them in living with the disease that has afflicted them. We find that the Community's group home "exhibit[s] [the] kind of stability, permanency and functional lifestyle which is equivalent to that of the traditional family unit." *Id.,* 491 A.2d at 22. We therefore conclude that the Community's use of the property as a group home

does not violate the Four Hills restrictive covenant.

## C. Findings Regarding Increased Traffic

██ 22. The Neighbors strenuously argue that the covenant should be interpreted to exclude the group home because the group home's operation has an adverse impact on the neighborhood. In support of this claim, the Neighbors point to the trial court's findings that "[t]he amount of vehicular traffic generated by [the] Community's use of the house ... greatly exceeds what is expected in an average residential area" and that, as a result, "the character of [the] residential neighborhood relative to traffic and to parked vehicles has been significantly altered to the detriment of this residential neighborhood and is [sic] residents." The Neighbors contend that these facts are uncontradicted and point out that this Court is bound by the factual findings of the trial court unless the findings are not supported by substantial evidence.[2] *Segal v. Goodman,* 115 N.M. 349, 353, 851 P.2d 471, 474 (1993).

23. However, the Neighbors fail to appreciate that the amount of traffic generated by the group home simply is not relevant to determining whether the use of the house as a group home violated the covenant in this case. A review of all the provisions in the covenant reveals that the restrictive covenants for the Four Hills Village, sixteenth installment, are not directed at controlling either traffic or on-street parking. The various covenants and restrictions that attach to the neighborhood homes merely regulate the structural appearance and use of the homes. For example, the covenants regulate building architecture, views, frontage, setback, visible fences and walls, signs and billboards, trash and weeds, trailers and campers parked in yards, maintaining livestock, and of course nonresidential uses of homes. However, not one of the fifteen provisions and numerous paragraphs of the covenants attempts to control the number of automobiles that a resident may accommodate on or off the property nor the amount of traffic a resident may generate.

24. The Neighbors do not contend that the amount of traffic and parking generated by the Community's home violates any covenant in and of itself, nor could they. They also do not argue that the covenants would prevent a traditional nuclear family, related by marriage or consanguinity, from generating a similar volume of traffic. The Neighbors do suggest, however, that the volume of traffic demonstrates that the group home is not functionally equivalent to a traditional single-family residence, as required by the covenants. However, the question whether the group home is equivalent to a traditional family residence must be evaluated in relation to the requirements of the covenants, which in this case are directed to maintaining the structural appearance of the house and restricting nonresidential uses. *Cf. Turner,* 772 P.2d at 630 (looking to other provisions of covenant to define nature of "family" restriction). There is no evidence that the volume of traffic generated by the group home interferes with the structural appearance of the house in violation of the covenants. Nor does the amount of traffic or parked vehicles alter the residential nature of the group home or modify the familial relationship of the residents.

25. We note that if we had concluded that the group home did violate the restrictive covenant, the amount of traffic generated by the nonconforming use might then become relevant in evaluating the harm suffered by the other landowners and in determining the appropriate remedy. However, the amount of traffic generated by the group home simply does not affect the threshold question whether Community's use of the property as

---

**2.** The neighbors presented records of their observations of traffic generated by the group home that were not contradicted by the Community. For example, one of the neighbors testified about the volume of traffic at trial, noting that she recorded 718 trips for the month of August 1993. However, a careful review of the statistical records in evidence reveals that a "trip" is defined as a one-way journey. Thus, every visit to the home and every errand run is counted as two trips each. This definition is contrary to what the witness indicated at the hearing when she stated, "For August I have a total of ... 718 trips down our street which would be *up and back.*" (Emphasis added). Putting these numbers in perspective, these 718 "trips" work out to an average of just under twelve visits or errands per day, or only three per resident each day.

a group home violates the restrictive covenant requirement that the property not be used for any purpose other than single-family residence purposes. Accordingly, because the covenants do not regulate traffic or off-street parking, and because the amount of traffic generated by the group home is irrelevant to whether the home is used for single-family residential purposes, we conclude that the Neighbors' argument is without merit.

## III. FAIR HOUSING ACT

■ 26. The Community's second contention is that the trial court erred in concluding that the FHA did not apply in the present case. Although we have already agreed with the Community on its first argument that it did not violate the restrictive covenants, given the importance of the issues raised, we review the Community's second claim in order to correct the trial court's erroneous ruling on the legal effect of the FHA. *Whitehurst v. Rainbo Baking Co.,* 70 N.M. 468, 470, 374 P.2d 849, 850 (1962) ("Conclusions of Law are reviewable by the supreme court, and where the facts are not in dispute this court is not bound by the conclusions of the trial court but may independently draw its own legal conclusions."); *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 510, 817 P.2d 238, 244 (1991) ("[A]n appellate court need not defer to the trial court's conclusions of law and, upon analysis of the record as established below, may reach a conclusion different from that of the trial court."). We find that, even if we were to adopt the Neighbors' proposed definition that the term "family" only included individuals related by blood or by law, we would still find for the Community because such a restriction would violate the FHA. *See, e.g., Deep E. Tex. Regional Mental Health & Mental Retardation Servs. v. Kinnear,* 877 S.W.2d 550, 554–58 (Tex.Ct.App. 1994) (finding group home did not violate restrictive covenants and further concluding enforcement of restrictive covenant violated FHA). We discuss the FHA below.

27. In the present case, the trial court did not make any findings directly holding that the FHA was inapplicable. However, it did set out the following conclusion of law:

4. Enforcement of the Restrictive Covenant is not discriminatory toward people with handicaps. Nothing in the Covenant prevents a person with a handicap from owning or renting a house in the Subdivision for personal use as a one family residence. The Restrictive Covenant applies equally to people with or without a handicap as defined in the cited statutes. No organization could rent a house for use as is present here to serve as a halfway home in criminal rehabilitation, as a home for recovering alcoholics, as a home for homeless, as a home for unwed mothers, as a home for battered spouses, as a home for delinquent children, as a home for single white males, or as a home for handicap [sic] people as defined by ... federal statutes.

Although the trial court did not discuss its analysis of the applicability of the FHA, reading this conclusion in conjunction with the numerous questions posed to the Community by the trial court at the hearing makes it apparent that the trial court believed that a facially neutral restriction which is equally applicable to both handicapped and nonhandicapped individuals does not implicate the FHA. However, this view of the FHA is incorrect.

28. Section 3604(f)(1) of the FHA provides in relevant part that it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of ... a person residing in or intending to reside in that dwelling after it is sold, rented, or made available." Section 3604(f)(3)(B) states, "For purposes of this subsection, discrimination includes ... a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling...."

29. Courts have interpreted these provisions as creating three distinct claims for violations of § 3604(f) of the FHA: discriminatory intent, disparate impact, and reasonable accommodation. *See Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n,* 790 F.Supp. 1197, 1210–11, 1221

(D.Conn.1992) (discussing each of these theories). The first two are based on § 3604(f)(1), whereas the third arises out of § 3604(f)(3). The Community has raised each of these claims and we will address each of them in turn.[3]

30. At the outset, we note that the Neighbors do not contest that persons with AIDS are considered handicapped under the FHA. *See Baxter v. City of Belleville,* 720 F.Supp. 720, 729 (S.D.Ill.1989) (noting that Congress intended to include persons who are HIV-positive under the FHA); *Support Ministries for Persons with AIDS, Inc. v. Village of Waterford,* 808 F.Supp. 120, 129–31 (N.D.N.Y.1992) (same, listing cases). Nor do they challenge the Community's standing to bring suit under the FHA. *See Baxter,* 720 F.Supp. at 730 (discussing standing).

## A. Discriminatory Intent

▮▮▮▮▮▮ 31. A discriminatory-intent claim focuses on whether a defendant has treated handicapped individuals differently from other similarly situated individuals. *McKinney Foundation,* 790 F.Supp. at 1211. "To prevail on its claim of discriminatory [intent], ... the plaintiff is not required to show the defendants were motivated by some purposeful, malicious desire to discriminate against HIV-infected persons." *Id.* "[The] 'plaintiff need only show that the handicap of the potential residents [of a group home], a protected group under the FHA, was in some part the basis for' the policy being challenged." *Potomac Group Home Corp. v. Montgomery County,* 823 F.Supp. 1285, 1295 (D.Md.1993) (second alteration in original) (quoting *Baxter,* 720 F.Supp. at 732).

32. The trial court in this case did not consider whether the residents' handicap served as a basis for enforcing the restrictive covenant. Instead the court focused solely on the neutral language of the covenant itself. The court apparently concluded that the FHA would not be violated by enforcement of a restrictive covenant that was neutral on its face. However, as the *Scott* court noted, "Given its breadth, the [FHA] would reasonably encompass the act of enforcing a neutral restrictive covenant through the judicial system for the purpose of denying equal housing opportunities to disabled individuals." *Scott,* 788 F.Supp. at 1562. In *Scott,* the court concluded that the defendants' efforts to enforce a neutral restrictive covenant with the purpose of keeping handicapped individuals out of the neighborhood violated the discriminatory-intent prong of the FHA. *Id.*

33. Turning to the present case, the Community argues that the Neighbors were aware of the Community's use of the property as a group home and decided to enforce the covenants, in part, because of antagonism to that use. The Community presented evidence that the Neighbors' traffic complaints began a few days after a newspaper article was published that described the group home and that the Neighbors inquired into the availability of other possible sites for the home outside of their neighborhood. The Community also identified several covenant violations by other landowners in the neighborhood that were not being prosecuted. However, this evidence is equivocal at best. Absent further evidence of an intent to enforce the covenant because of some animus toward the use of the property as a group home because the residents have AIDS, the Community's allegations are insufficient to support a claim for discriminatory enforcement of the covenant.

## B. Disparate Impact

▮▮▮▮▮▮ 34. To demonstrate a violation of the FHA under the disparate-impact analysis, a plaintiff need only prove that the defendant's conduct actually or predictably results in discrimination or has a discriminatory effect. *Support Ministries,* 808 F.Supp.

---

**3.** The Community also raises a claim under § 3617 of the FHA which provides:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

However, we need not address this claim given our resolution of the Community's § 3604 claims.

at 136. "The plaintiff need make no showing whatsoever that the action resulting in ... discrimination in housing was ... motivated [by a desire to discriminate against the handicapped]. Effect, and not motivation, is the touchstone." *McKinney Foundation,* 790 F.Supp. at 1216 (quoting *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)). "This method of proving a violation of the Act relieves the plaintiff of the onerous burden of proving discriminatory intent." *Id.* The court in *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), set out four factors to be balanced when evaluating a discriminatory-impact claim: 1) how strong is plaintiff's showing of discriminatory impact; 2) is there any evidence of discriminatory intent; 3) what is the defendant's interest in taking the challenged action; 4) is the plaintiff seeking to compel the defendant to affirmatively provide housing to the handicapped or merely to restrain the defendant from interfering with individual landowners who wish to provide this housing.

35. In the present case, the trial court failed to analyze any of these factors, again relying solely on the fact that the covenant was equally applicable to all group homes, for both the handicapped and non-handicapped. However, as the Texas Court of Appeals noted, "It is now well established that the Fair Housing Act prohibits the enforcement of restrictive covenants that discriminate or *have the effect of discriminating* on the basis of handicap." *Kinnear,* 877 S.W.2d at 558 (emphasis added); *see also Martin v. Constance,* 843 F.Supp. 1321, 1326 (E.D.Mo.1994) ("The private defendants' argument that the [FHA] only reaches special restrictive covenants that specifically prohibit the sale or rental of a dwelling to handicapped individuals is ... without merit."). Accordingly, enforcement of the Four Hills restrictive covenant is subject to a disparate-impact analysis.

36. Applying the four-factor balancing test enunciated in *Metropolitan,* we find that the Community has proved that enforcing the covenant as interpreted by the Neighbors would violate the FHA. First, the covenant, which attempts to limit group homes, has the discriminatory effect of denying housing to the handicapped. Individuals with disabling handicaps, such as the one suffered by the Community's residents, frequently require congregate living arrangements for physical assistance and psychological and emotional support in order to live outside of an institution and in a residential community. *See Support Ministries,* 808 F.Supp. at 132 (noting AIDS patients may not be able to live on their own in private residences); *Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179, 1183 (E.D.N.Y. 1993) (noting that recovering alcoholics may require group home environment). Without congregate living arrangements many disabled individuals would be unable to reside in traditional neighborhoods or communities and would be forced into hospitals and institutions. *Cf. Fort Stanton,* 757 F.Supp. at 1282–96 (noting that alternative to congregate living arrangements for developmentally disabled individuals is institutionalization and discussing benefits of congregate living arrangements over institutionalization). *See generally Martin,* 843 F.Supp. at 1325–26 ("[The FHA] is intended to prohibit restrictive covenants ... which have the effect of excluding, for example, congregate living arrangements for persons with handicaps."). Because the negative effects of covenants that restrict congregate living arrangements are substantially more onerous for the disabled than for others, the first factor weighs heavily in favor of the Community.

37. The second factor is whether there is any evidence of discriminatory intent that would bolster a disparate-impact claim. As noted in our discussion of the Community's separate discriminatory-intent claim, the evidence the Community has presented with regard to the Neighbors' discriminatory intent is equivocal at best. However, the *Metropolitan* court made clear that this intent factor is the least important of the four factors weighed in a disparate-impact claim, and the lack of significant evidence of intent is by no means detrimental to that claim. *Metropolitan,* 558 F.2d at 1292.

38. The third factor is the defendant's interest in enforcing the covenant. An important consideration in evaluating this factor is the nature of the interest being enforced, whether it is a private right benefitting individuals or a governmental interest protecting the public welfare. As the *Metropolitan* court explained, "If the defendant is a private individual or a group of individuals seeking to protect private rights, the courts cannot be overly solicitous when the effect is to perpetuate segregated housing." *Id.* at 1293 (giving more weight to governmental actions in the public interest than to private actions enforcing private rights). Here, the Neighbors' interest is to eliminate the increased traffic that the trial court found had detrimentally altered the residential character of the neighborhood. This is a legitimate interest which weighs in the Neighbors' favor. However, this factor weighs less in our analysis because the interest served by enforcement of the covenant is private rather than public.

39. Finally, we must consider the nature of the relief that the plaintiff is seeking. The Community is not attempting to force the Neighbors to provide housing for the disabled. It simply seeks to prevent the Neighbors from interfering with its operation of the group home. This factor strongly favors the Community. "[T]he Courts are far more willing to prohibit even nonintentional action . . . which interferes with an individual's plan to use his [or her] own land to provide integrated housing." *Id.*

40. Accordingly, we must balance the Neighbors' interest in avoiding increased traffic against the Community's interest in providing housing to disabled individuals. We view these interests in light of the fact that the Community is seeking only to prevent the Neighbors from interfering with its ability to provide this housing and is not seeking to require the Neighbors to act affirmatively.

41. We conclude that the FHA factors weigh in favor of the Community. A covenant that restricts occupancy only to related individuals or that bars group homes has a disparate impact not only on the current residents of the Community's group home who have AIDS but also on all disabled individuals who need congregate living arrangements in order to live in traditional neighborhoods and communities. As we noted above, there is a very strong public policy favoring placement of disabled individuals in congregate living arrangements located in traditional residential community settings such as Four Hills. Of course, one possible consequence of congregate living arrangements is that they have the potential to generate more traffic than a typical nuclear family. In the present case the trial court made a finding that the increased traffic generated by the Community's group home has negatively affected the residential character of the neighborhood. However, we find it significant that the trial court rejected the Neighbors' proposed finding of fact that this additional traffic posed any increased safety hazard to the neighborhood. Failure to adopt a proposed finding of fact is in effect a negative finding with respect to that fact, which binds this Court on appeal. *Kimberly, Inc. v. Hays,* 88 N.M. 140, 143, 537 P.2d 1402, 1405 (1975).

42. Accordingly, we conclude that the negative effects of increased traffic, without any additional harms, are outweighed by the Community's interest in maintaining its congregate home for individuals with AIDS. Because the Community has proved a "disparate impact" under the FHA, the Neighbors cannot enforce the covenant against the Community. *See Kinnear,* 877 S.W.2d at 556–58 (noting that the FHA prevented enforcement of a "one-family residence" covenant against group home for developmentally disabled); *Scott,* 788 F.Supp. at 1562 (same); *cf. Oxford House,* 819 F.Supp. at 1184 ("Even if the Town's proposed enforcement of its zoning ordinance advances a legitimate governmental interest, the Court nevertheless finds that plaintiffs' showing of discriminatory effect far outweighs the Town's weak justifications."); *Baxter,* 720 F.Supp. at 732 (applying FHA factors and finding likely violation by zoning ordinance that prevented group home for HIV-positive individuals).

**C. Reasonable Accommodation**

43. The Community's third claim under the FHA is that the Neighbors failed

to make reasonable accommodations under § 3604(f)(3)(B). This section provides that "discrimination includes ... a refusal to make reasonable accommodations in rules, policies, practices or services when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." *Id.* " 'Reasonable accommodation' has been defined [to include] 'changing some rule that is generally applicable so as to make its burden less onerous on the handicapped individual.' " *North Shore–Chicago Rehabilitation, Inc. v. Village of Skokie,* 827 F.Supp. 497, 508 (N.D.Ill.1993) (quoting *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992)); *see also United States v. City of Philadelphia,* 838 F.Supp. 223, 228 (E.D.Pa.1993) (noting that cities must waive, change, or make exceptions in restrictive zoning rules to afford handicapped individuals equal opportunity to use and enjoy housing), *aff'd,* 30 F.3d 1488 (3rd Cir. 1994). In *City of Philadelphia,* the court explained that "an accommodation is not reasonable (1) if it would require a fundamental alteration in the nature of a program, or (2) if it would impose undue financial or administrative burdens on the defendant." *City of Philadelphia,* 838 F.Supp. at 228. Although § 3604(f)(3)(B) is more frequently applied to restrictive zoning ordinances, it is equally applicable to restrictive covenants. *See, e.g., Martin,* 843 F.Supp. at 1326 ("Even if there was a consistent policy and practice of enforcing the restrictive covenant against perceived violations, the Court finds that under the facts of this case the attempt to enforce the covenant constituted a refusal to make a 'reasonable accommodation' necessary to afford plaintiffs an equal opportunity to use and enjoy a dwelling.").

■ 44. In the present case, the trial court did not consider whether the Neighbors failed to make a reasonable accommodation under the FHA when they enforced the covenant against the Community's group home. Again the trial court apparently was satisfied by the fact that the restrictive covenant was facially neutral, applying equally to all groups, handicapped and nonhandicapped alike. However, as the *City of Philadelphia* court makes clear, there need be no "causal

nexus" between the challenged provision and the handicaps of the residents. *City of Philadelphia,* 838 F.Supp. at 229. In other words, the restriction does not need to be directed at the handicapped. It does not even need to have a disparate impact on handicapped groups in general. *Id.* at 230. The restriction need only serve as an impediment to an individual plaintiff who is handicapped and is denied access to housing in order to implicate the "reasonable accommodation" requirement of the FHA. *Id.; see also Horizon House Developmental Servs., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 699 (E.D.Pa.1992) ("One of the purposes behind the reasonable accommodation provision is to address *individual* needs and respond to *individual* circumstances." (Emphasis added)), *aff'd,* 995 F.2d 217 (3rd Cir.1993).

45. In *City of Philadelphia,* a charitable organization wanted to convert a commercially zoned building to a residential use for operation of a group home for the mentally impaired. *City of Philadelphia,* 838 F.Supp. at 226. The local zoning ordinance required that a residential building have a rear yard. *Id.* Although the building lacked a rear yard, it had a large side yard which the organization contended was a reasonable substitution for the rear yard, and the organization requested a variance on that ground. The city declined to issue a variance, which effectively prevented the organization's proposed use of the building for a group home. *Id.* at 226–27. On appeal the city argued that it did not violate the FHA because there was no causal connection between the zoning ordinance and the future residents' handicaps. *Id.* at 229. The court rejected this argument. It noted that requiring a causal connection or discriminatory impact, as with a disparate-impact claim under § 3604(f)(1), would render § 3604(f)(3)(B) superfluous. *Id.* at 230. Thus, even though the city's rear yard zoning requirement was facially neutral and affected handicapped and nonhandicapped individuals equally, the ordinance prevented those specific handicapped individuals in *City of Philadelphia* from gaining access to the proposed housing, and there-

fore it implicated the reasonable-accommodation prong of the FHA. *Id.* .

46. In the present case, the proposed interpretation of the Four Hills restrictive covenant also has the effect of denying housing access to the handicapped residents. Accordingly, § 3604(f)(3)(B) of the FHA is implicated, and the Neighbors would be required to reasonably accommodate the group home provided it would not require a fundamental alteration in the nature of the restrictions or impose undue financial or administrative burdens on the Neighbors.

47. The Neighbors do not suggest that allowing the group home to operate would impose any financial or administrative burdens on them. The Neighbors are not responsible for operating or maintaining the group home in any way, nor do they have to pay any additional costs as a result of the group home. Furthermore, nonenforcement of the single-family residence requirement against the Community's group home would not fundamentally alter the nature of the restrictions. As discussed above, the Four Hills restrictive covenants as a whole were designed to regulate the structural appearance of houses and to prevent the use of houses for business purposes. The Community's use of the property for a group home does not affect its structural appearance and is not a business use. The residents use the house like a traditional residential home and act as a second family for one another. Indeed, the Neighbors' stated reason for enforcing the restrictive covenant is not because of the nonresidential nature of the occupancy, but because of the additional traffic generated by the group home. However, traffic regulation is not a fundamental aspect of the Four Hills restrictive covenants.[4]

48. Accordingly, we conclude that nonenforcement of the Four Hills restrictive covenants against the Community's group home would not impose an undue hardship or burden on the Neighbors and would not interfere with the plain purpose of the covenants.

As the *Martin* court noted in a similar case, "A reasonable accommodation would have been not to seek enforcement of the covenant." *Martin*, 843 F.Supp. at 1326. Conversely, the Neighbors' efforts to enforce the covenant as restricting residency to individuals related by blood or by law violated § 3604(f)(3)(B) of the FHA because they failed to provide a reasonable accommodation that would afford the current disabled residents continued access to housing. Therefore, the reasonable-accommodation prong of the FHA would also bar enforcement of the restrictive covenant if it prevented the Community's use of the house as a congregate living arrangement for people with AIDS.

49. The FHA is designed to help provide disabled individuals the opportunity to live in traditional community settings by removing obstacles that hindered their quest for independent living. The FHA's application is clear when disabled individuals are confronted with intentional housing discrimination motivated by bigotry or misunderstanding of their handicaps. However, the FHA is also designed to help the disabled overcome the subtle effects of unintentional, facially neutral, or even well-meaning restrictions that have the consequence of denying housing to the handicapped.

## IV. THE COMMUNITY'S COUNTERCLAIM

50. In its counterclaim the Community alleged again that the Neighbors' actions violated the FHA, and it requested relief in the form of a permanent injunction against the Neighbors to prevent them from "engaging in conduct which denies persons with disabilities the equal opportunity to use and enjoy a dwelling." The Community also requested an award of attorney's fees pursuant to Section 3613(c)(2) of the FHA which provides in relevant part that "the court, in its discretion, may allow the prevailing party ... a

---

4. It is important to note again that the trial court found the traffic did not constitute a health or safety hazard to the neighborhood. The FHA expressly prohibits accommodations that would jeopardize the health or safety of others. Section 3604(f)(9) ("Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.").

reasonable attorney's fee and costs." Concluding that there had been no violation of the FHA, the trial court dismissed the counterclaim.

51. On appeal, the Community requests an award of appellate attorney's fees, as well as fees incurred at the trial court level. Having considered these requests in light of the Neighbors' nondiscriminatory justification for attempting to enforce the covenant and the trial court's findings regarding the group home's impact on the neighborhood, we decline to award attorney's fees to the Community. Nor do we think a permanent injunction against the Neighbors is appropriate here. "Injunctions are harsh and drastic remedies which should issue only in extreme cases of pressing necessity and only where there is no adequate and complete remedy at law." *Padilla v. Lawrence*, 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct. App.), *cert. denied*, 101 N.M. 419, 683 P.2d 1341 (1984). The Community has made no showing that the Neighbors plan future conduct that would violate the Community's rights under the FHA, nor should we assume they will not comply with this opinion. Therefore, because we conclude that the Community is not entitled to the relief requested in its counterclaim, we affirm the trial court's dismissal of that counterclaim.

## V. CONCLUSION

52. We conclude that the Community is entitled to continue operating its group home for individuals with AIDS both under the Four Hills restrictive covenants and under the Fair Housing Act. Accordingly, for the reasons discussed above, the trial court's ruling is reversed and the injunction is vacated. The trial court's dismissal of the counterclaim is affirmed.

53. **IT IS SO ORDERED.**

BACA, C.J., and RANSOM, FRANCHINI and MINZNER, JJ., concur.