56 A.3d 365

**SOUTH KAYWOOD COMMUNITY ASSOCIATION**

v.

**Rodney M. LONG, et ux.**

**No. 00691, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Nov. 26, 2012.

Karen F. Silverstrim, Salisbury, MD, for appellant.

Laura E. Hay (Thomas J. Maloney, Cockey, Brennan & Maloney, PC, on the brief) Salisbury, MD, for appellant.

Panel: WOODWARD, KEHOE and JAMES P. SALMON (Retired, Specially Assigned), JJ.

JAMES P. SALMON (Retired, Specially Assigned), J.

This case concerns a restrictive covenant placed in the land records in 1961 that governs lots in the South Kaywood subdivision which is located in Salisbury, Maryland. The principal issue to be decided is whether a restrictive covenant that governs the subdivision and limits the use of lots to "single family residences" but does not define the word "fami-

ly," prohibits an owner of a lot in that subdivision from renting the property to persons who are not related by blood, marriage, or adoption. Although no Maryland appellate court has considered that issue, courts in our sister jurisdictions that decided cases near the time the covenant at issue was drafted, or earlier, have done so but have reached divergent results. *See,* for example, *Marino v. Mayor & Council,* 77 N.J.Super. 587, 187 A.2d 217, 220–21 (Law Div.1963) (an unrelated man and woman living together may be a "family"); *Simons, et al. v. Work of God Corporation,* 36 Ill.App.2d 199, 183 N.E.2d 729, 731 (1962) (Restrictive covenant limiting use of property to one housekeeping unit by a single family interpreted to mean that the property could be used only by persons related by blood or marriage (plus domestic servants)); *Stafford v. Village of Sands Point,* 200 Misc. 57, 102 N.Y.S.2d 910, 913 (N.Y.Sup.Ct.1951) (the "family" consists of those living together in one house, under the same management, with a common goal); *G.M.G. Realty Co. v. Spring,* 191 Misc. 334, 77 N.Y.S.2d 732, 734 (N.Y. City Mun.Ct.1948) (the "family" consists only of a blood related father, mother, and children); *Liberty Nat'l Bank of Chi. v. Zimmerman,* 333 Ill.App. 94, 77 N.E.2d 49, 52 (1947) (relying upon Webster's Dictionary, which defined family as "the collective body of persons who live in one house and under one head or manager"); *Boston–Edison Protective Association v. The Paulist Fathers, Inc.,* 306 Mich. 253, 10 N.W.2d 847, 848 (1943) (court rejected the plaintiffs' invitation to define family as persons related by blood or marriage and went on to rule that a group of unrelated Roman Catholic Priests could reside in a neighborhood limited to single family dwelling houses without violating the restrictive covenant); *Robbins v. Bangor Ry. & Elec. Co.,* 100 Me. 496, 62 A. 136, 140 (1905) (quoting definition of family found in Webster's Dictionary: "persons collectively who live together in a house or under one head or manager; a household including parents, children, and servants and as the case may be boarders"); *Oystead v. Shed,* 13 Mass. 520, 523 (1816) (Boarders and lodgers are a "family"). Cases decided since 1963 have also reached divergent results when considering the meaning of

the term "single family." *See* Anno. 71 A.L.R.3d 693, "What Constitutes a 'Family' Within Meaning of Zoning Regulations or Restrictive Covenant" by James L. Rigelhaupt, Jr., (1976) (hereinafter Rigelhaupt). In the case *sub judice*, the Circuit Court for Wicomico County granted the plaintiffs' request for a declaratory judgment and ruled, *inter alia*, that the term "single family" as used in a restrictive covenant, did not restrict use of the property to persons related by blood, marriage, or adoption. The appellant in this case, South Kaywood Community Association (hereinafter "the Association"), contends that the Circuit Court erred in its construction of the restrictive covenant. For the reasons set forth below, we shall affirm the judgment of the Circuit Court insofar as it declared that the "single family" restriction did not prevent the appellees from renting houses they owned to persons not related by blood, marriage, or adoption.

## I.

The appellees, Rodney Long and his wife, Melinda B. Long, purchased two homes in the South Kaywood subdivision in Salisbury, Maryland in 2006. The houses are both located on South Kaywood Drive and as a consequence of purchasing these houses, the Longs became members of the Association. Presently, the property located at 1704 South Kaywood Drive is leased to a married couple with two children. But, the home located at 1602 South Kaywood Drive is leased to three female undergraduate students who attend Salisbury University. Those students are not related to each other by blood, marriage, or adoption.

Upon learning of the familial status of the three students, the appellant, an unincorporated community association, sent letters to the Longs in which it asserted that rental to unrelated occupants constituted a violation of the covenants that governed all lot owners in the South Kaywood subdivision.

The appellant relied upon the first paragraph [Item I] of a covenant that was filed in the Land Records of Wicomico County on February 24, 1961. Item (I) states:

That not more than one private dwelling house or residence and a garage solely for the use of the owner or occupier thereof shall be erected or placed upon any one of the lots conveyed herein, and such house or residence *shall never be used or occupied for any purpose except for that of a private residence exclusively, nor shall any part or portion thereof ever be used or occupied except solely as a single family residence;* nor shall any lot or any part thereof ever be used or occupied for trade, business or professional purposes of any kind whatsoever, nor shall any signs or other displays of any commercial nature be erected.

(Emphasis supplied.)

The Longs disagreed with the appellant's interpretation of the covenant and as a result, filed a declaratory judgment action in the Circuit Court for Wicomico County asking the court to declare that Item I of the covenant did "not require all individuals residing on [their] property within the Kaywood subdivision to be related...." The Association filed a timely answer to the complaint for declaratory judgment in which it asked, insofar as here pertinent, that the court declare "that Item I of the covenants ... does mean that homes are to be used or occupied solely as single a family residents ...." [sic] [1] No counter-claim was filed by the Association.

Both sides filed motions for summary judgment in their favor, but the motions were not decided. Instead, an evidentiary hearing was held on April 22, 2010. Mr. Long was the sole witness called on behalf of the appellees at the hearing. The appellant called several witnesses who were all members of the Association.

---

1. The Association's request for relief was odd. It would do no good to declare that the Longs' homes "are to be used or occupied as single family residences." The covenant already says that and therefore the declaration requested avoids the real issue presented. The complaint filed by the Longs was more definitive in that they asked that the court declare that the covenant at issue did not restrict use of the premises to persons who were related by blood, adoption, or marriage.

## II.

## Summary of evidence produced at trial.

### A.  *Testimony of Mr. Long.*

In his testimony, Mr. Long admitted that the three college students who leased the property located at 1602 South Kaywood Drive were not related.  The lease with the students was for one-year.  Under the lease, each of the students were individually liable for damages that might be done to the property during the term of the lease and the leasees were also collectively responsible for cleaning and maintenance of the interior of the house.  During cross-examination, Mr. Long summed up his testimony in regards to his tenants' living arrangements as follows:

"They maintain the property.  They share equal responsibility for the property.  They share any damages equally in the property.  They eat their meals together in this property."

Mr. Long added that although the lease would expire in July, 2010, he believed that the students intended to renew their lease.

During direct and cross-examination, Mr. Long was questioned in regard to the zoning status of the property.  He testified that the properties that he and his wife own on South Kaywood Drive are in the R–1 District, which is reserved for single family residences.  The definition of "family" that governs property in the R–1 District in Wicomico County, is set forth in the Wicomico Zoning Code as follows:

FAMILY

Means either (a) one person, or two unrelated persons and the children of either of them, or (b) two or more persons related by blood or marriage, or (c) *a group of not more than four persons not necessarily related by blood or marriage.*  In any case, the group *must be living together as a single housekeeping unit.*  In all cases, foster children placed by an agency licensed to operate in Maryland housed on the premises are considered as members of the family.

Wicomico County Zoning Code, Section 225–25 B. (emphasis added).

As can be seen, three unrelated college students living together in a residence would not violate the provisions governing property in the R–1 District, so long as the students lived together as a "single housekeeping unit." [2]

Mr. Long was also cross-examined about provisions in Sections 225–46(c)(2) of the Wicomico County Zoning Code, which governs property located in an overlay district. Neither of the properties owned by the Longs were in the overlay district, but if they had been, a different definition of "family" would apply. Section 225–46(c)(2) reads: "for any use that includes the term' family,' the following definition should apply; one person or two or more persons related by blood or marriage, or a group of not more than two persons not necessarily related by blood or marriage, in any case, living together as a single housekeeping unit." [3]

## B. *Evidence Introduced by the Association.*

The Association, although it steadfastly maintained in the trial court that the covenant in question was unambiguous, nevertheless, asked several of the witnesses it called to give their views as to what the covenant meant.

Barry Beauchamp had lived in the South Kaywood Community for five years and, at the time of the trial, was the President of the Association. He was asked what, in his view, constituted a "family" as that term was used in the covenant. Mr. Beauchamp defined a family as "husband and wife, chil-

---

**2.** In *Armstrong v. Baltimore*, 410 Md. 426, 448–452, 979 A.2d 98, the court provides a lengthy analysis of the meaning of the term "single housekeeping unit." In this appeal, the Association did not brief the issue of whether three college students living together constitute a single housekeeping unit within the meaning of the Wicomico County Zoning Code.

**3.** In its brief, appellant says that the Wicomico Zoning Code, under section "225–46" contains "a specific 'single family definition,' ... [w]hereas, section 225–25 provides only a 'general family' definition." This is not correct. Both sections simply define the word "family."

dren." He then added that a "family" could also include a "boyfriend and girlfriend that ... [are] living as a family." He also stated that he would consider it a family if the occupants were parents who had raised children but the children had left the home.

Clinton Broadway, Jr., the Vice President of the Association, testified that he had lived on South Kaywood Drive for 20 years. He described the area as a "stable neighborhood" located approximately three and one-half miles from Salisbury University. Steward Haenel had lived in the South Kaywood subdivision since December of 1974. He defined a "single family residence" as "father, mother, children, and descendants of a common progenitor." He testified that in his 36 years in the neighborhood, he had not known of any other homeowner who had not "lived as a single family in their homes."

Lee Edward Tate, III, testified that he had lived in the South Kaywood neighborhood since 1991. The three college students who rented the Long's property lived near his home. He opined that the students were not using the property as a "single family household." He interpreted the words "single family" as meaning "two persons being of opposite sex, of course, with children [or] planning to be married, planning to use the facility for a family." He then added that he believed that if a same sex couple purchased a home and had children, they too would be a single family but a group of college students would not—under his conception of what the common understanding was of the meaning of the phrase "single family." He clarified his definition by saying that a "same sex couple" would constitute a family only if they "were there truly as a couple." Also, according to Mr. Tate, the dwelling would be used as a single family dwelling if a couple had "adopted someone or if they had taken in a foster child" so long as there were two adult individuals engaged in child rearing. He further explained that in his opinion, "children don't necessarily have to be blood related, but they can be adopted or maybe it's the sister-in-law's child or something happened and somebody died and they inherited it, those

children. That's a family to me." Also included in his definition was a same sex couple who had taken into their care a foster child. After giving this rather flexible definition of the meaning of "single family," he said that: "the whole linchpin to any definition" of what constitutes a family is that the persons living together have "a long-term commitment" and are "all operating as a family to raise these kids that are under 18 to become adults."

Mr. Tate concluded his testimony by conceding, in an answer to a question by the court, that it was true that "lots of people have lots of definitions about family ..." and, therefore, the definition is "somewhat subjective."

## III.

### Trial Judge's decision.

The trial judge concluded that the language set forth in Item I of the covenant did not "require residents of property within the Kaywood subdivision to be related by blood, marriage, or adoption." The court went on to say that the occupation of 1602 South Kaywood subdivision by three unrelated college students conforms to the provisions of the covenants and restrictions and is consistent with the applicable Wicomico County Zoning Regulations. The trial Judge also found:

> that the language [in] paragraph 1 of the covenant, is ambiguous with respect to the term 'single family residence' in modern day society. The ambiguity is amply supported by that divergent interpretation placed on that provision by the parties.

The judge added that the ambiguity was not resolved by consideration of extrinsic evidence.

## IV.

### Discussion.

At the outset, it is important to focus on what the Longs asked the circuit court to declare, i.e., that the covenant did

not restrict the use of the property to persons related by blood, marriage, or adoption. It is obvious that the reason the request for relief was so limited was because the Association had, prior to suit, only claimed a violation because the three coeds were not related by blood, marriage, or adoption. That was the justiciable controversy presented to the trial court. And, as already mentioned, the Court did resolve that controversy.

■ The Court went further, however, and declared: 1) that three unrelated college students living together in the subdivision did not violate the covenant, and 2) that use of the premises by the coeds did not violate the zoning ordinance. In the complaint for declaratory judgment, the court was not asked to make a declaration as to those issues. We shall hold, therefore, that the court erred in entering a declaratory judgment that was not requested in the plaintiff's complaint.

In *Lowden v. Bosley*, 395 Md. 58, 65–67, 909 A.2d 261 (2006), the rules that govern our analysis of the covenant at issue were set forth, viz:

> This Court on numerous occasions has set forth the principles governing the interpretation and application of restrictive covenants. *See, e.g., Miller v. Bay City Property Owners Ass'n*, 393 Md. 620, 903 A.2d 938 (2006); *Roper v. Camuso*, 376 Md. 240, 829 A.2d 589 (2003); *County Commissioners v. St. Charles*, 366 Md. 426, 784 A.2d 545 (2001); *Belleview v. Rugby Hall*, 321 Md. 152, 157, 582 A.2d 493, 495 (1990); *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955); *Himmel v. Hendler*, 161 Md. 181, 155 A. 316 (1931); *Maryland Coal Co. v. Cumberland and Penn. R.R.*, 41 Md. 343 (1875); *Thruston v. Minke*, 32 Md. 487 (1870).

> As Judge Cathell for the Court emphasized in *Miller v. Bay City Property Owners Ass'n, supra*, where the language of an instrument containing a restrictive covenant is clear with regard to the controversy before the court, there is no occasion to consider extrinsic evidence concerning the intent reflected in the restriction. The Court in *Miller* explained (393 Md. at 637, 903 A.2d at 948, quoting *Mary-*

*land Coal Co. v. Cumberland and Penn. R.R., supra,* 41 Md. at 352):

"In determining the intent of the parties we must begin with the actual language used in the [instrument]: 'If the intention of the parties is plainly manifest upon the face of the instrument, there is no room for interpretation and there is nothing left for the courts but to carry into effect the intention of the parties so ascertained, unless prevented from doing so by public policy or some established principle of law.' "

Moreover, a lack of ambiguity in the application of the restrictive covenant may be gleaned or reinforced by other language in the instrument. *Miller,* 393 Md. at 638, 903 A.2d at 948 ("It is also useful to look at the language used in the other sections of the . . . deed").

It is only where the restrictive covenant is ambiguous that courts venture beyond the text of the instrument and consider extrinsic evidence. *Miller,* 393 Md. at 634–637, 903 A.2d at 946–948; *County Commissioners v. St. Charles, supra,* 366 Md. at 445–448, 784 A.2d at 557. In construing ambiguous restrictive covenants, this Court at one time held that "a strict construction standard was applicable to promote the free alienability of land," that "the courts were to hold the restriction to its narrowest limits," and that the ambiguity should be resolved in favor of the unrestricted use of the property. *St. Charles,* 366 Md. at 445–446 and n. 17, 784 A.2d at 556–557 and n. 17. More recently, however, *"Maryland courts no longer apply a pure strict interpretation or construction, but apply rather, a reasonably strict construction when construing covenants." St. Charles,* 366 Md. at 447, 784 A.2d at 557. The "reasonably strict construction" principle was explained in *Belleview v. Rugby Hall, supra,* 321 Md. at 157–158, 582 A.2d at 495:

"If the meaning of the instrument is not clear from its terms, 'the circumstances surrounding the execution of the instrument should be considered in arriving at the intention

of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources.' "

\* \* \*

"If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement."

*Id.* at 65–67, 909 A.2d 261. (Emphasis added). *See also 600 N. Frederick v. Burlington,* 419 Md. 413, 441, 19 A.3d 837 (2011) ( [a]pplying properly a reasonably strict construction to interpretation of restrictive covenants means that "if there is ambiguity in [a restrictive covenant's] meaning, any doubt should be resolved in favor of the unrestricted use of the property, if it reasonably can be done") (quoting *Baltimore Butchers Abattoir & Live Stock Co., Inc. v. Union Rendering Co.,* 179 Md. 117, 123, 17 A.2d 130 (1941)).

The covenant here at issue was filed in the land records in February, 1961 and, presumably, was written shortly before that date. No witness testified as to what the drafter of the covenant meant by the term "single family." In fact, as far as we can discern, no witness called by the Association would have any way of knowing what the drafter intended because none of them lived in the South Kaywood area until long after the covenant had been filed. Moreover, the extrinsic evidence introduced by the Association concerning the meaning of the term "single family" is not useful in determining what the drafter intended. In every instance, witnesses called by the Association simply gave their own subjective interpretation as to what the phrase meant. Those interpretations were far from consistent. Moreover, we can find no language in other paragraphs of the restrictive covenants that provides guidance as to what the drafter of the covenant intended.

In *Armstrong v. Baltimore,* 410 Md. 426, 979 A.2d 98 (2009), the Court of Appeals was called upon to determine whether the Baltimore City Board of Municipal and Zoning Appeals ("the Board") misconstrued the term "single housekeeping

unit" as that term was used in the Baltimore City Zoning Code. *Id.* at 453, 979 A.2d 98. The issue arose because a builder received a permit from the City to build an apartment building consisting of twenty-six dwelling units. *Id.* at 429, 979 A.2d 98. The Baltimore Zoning Code provided that a dwelling unit may be occupied by no more than one family. *Id.* "Family" was defined as "four unrelated individuals (and no more) who live together" if they form a "single housekeeping unit." *Id.* The Zoning Code did not define the term "single housekeeping unit." *Id.* In *Armstrong,* a residential building had been constructed that consisted of twenty-six four-bedroom apartments. The owner of the building, Cresmont Properties, Inc. [Cresmont], intended to rent each apartment unit to four unrelated individuals. *Id.* Each apartment unit consisted of "four bedrooms and a common area and a bathroom and kitchen facilities." *Id.* Although there were twenty-six four-bedroom suites, petitioners, a group of neighborhood residents, contended that the suites contained four dwelling units each. *Id.* at 433–34, 979 A.2d 98. Cresmont disagreed and contended:

> that each of the twenty-six suites satisfied the Code definition of a "dwelling unit." A "dwelling unit," Cresmont observed, is a rental unit that contains a bathroom, kitchen facilities, and is occupied by a "family." Cresmont proffered that the tenants of each suite would constitute a "family," despite having separate leases, because they would be "living together as a single housekeeping unit," as required by the Code definition of "family."

*Id.* at 434, 979 A.2d 98. (Footnotes omitted).

The *Armstrong* Court held that substantial evidence existed to support the Board's finding that the building permit was appropriately issued to Cresmont because the building was going to accommodate 26 dwelling units. 410 Md. at 453, 979 A.2d 98.

The decision in *Armstrong,* although relied upon by both parties below, is not here apposite because in *Armstrong* the Court made no attempt to define the term "single family."

The Court did, however, provide some legal history, that has relevance, viz:

*In re Appeal of Miller,* 511 Pa. 631, 515 A.2d 904, 907 n. 3 (1986) (citing EDWARD N. BASSETT, ZONING 189 (1940 ed.)) The court offered the following epistemological lesson on the term's ["single housekeeping unit's"] history:

Alfred Bettman in a law review article written in 1924 stated the proposition that "promotion of the single family home . . . is deemed good public policy in America." Bettman, *Constitutionality of Zoning,* 37 Harv. L.Rev. 834, 839–40 (1924). From that point "zoning spread swiftly, particularly in suburban communities." J.R. Richards, *Zoning For Direct Social Control,* 5 Duke Law Journal, 761, 767 (1982). At an early stage of that development the legitimacy of exclusive single-family districts was settled. *However, the question that emerged was how, if at all, a given ordinance should define the term "family." Initially, a significant number of ordinances resolved that issue by leaving the word undefined.* See, e.g. Baltimore, Md.Code art. 49 § 1 (1928); Birmingham, Ala., General Code Ordinance 1101–C, art. I, § 1 (1930). The consequence of that approach was to leave the resolution of the term "single family" to the courts. *See, e.g., Brady v. Superior Court,* 200 Cal.App.2d 69, 77–82, 19 Cal.Rptr. 242, 247–49 (1962); *Region 10 Client Management, Inc. v. Town of Hampstead,* 120 N.H. 885, 887, 424 A.2d 207, 208–09 (1980); *Carroll v. Washington Township Zoning Comm'n,* 63 Ohio St.2d 249, 251, 408 N.E.2d 191, 193 (1980). The weakness of that strategy was the uncertainty it created and also the attendant cost of litigation.

As the dissatisfaction with reliance solely upon judicial interpretation for the definition of the term "family" became increasingly apparent, the drafters of those ordinances attempted to legislatively set forth a more precise meaning with the ordinances. One of the early formulations used to define "family" within the terms of those provisions was that of a "single housekeeping unit." *See, e.g., Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed.

303 (1926). The ordinance in effect, in the instant Township prior to the 1978 amendment, used the "housekeeping unit" formulation. Regrettably, this attempt to define "family" did not supply the degree of clarity it was intended to provide. A review of the cases throughout the country indicates that the change served only to focus the litigation upon a determination as to the meaning of a "housekeeping unit." In those cases interpreting zoning ordinances wherein the "family" limitation had been defined as a "single housekeeping unit," many extended family groups were deemed to fall within that category. The use of this test was viewed as extending beyond the occupancy by a one-family unit to a determination as to whether it was a one-housekeeping unit. *See Neptune Park Ass'n v. Steinberg,* 138 Conn. 357, 84 A.2d 687 (1951). *The focus was on whether the unit functioned as a family unit, rather than on the respective relationships that existed between the members of the unit. See, e.g., City of Syracuse v. Snow,* 123 Misc. 568, 205 N.Y.S. 785 (Sup.Ct.1924) ("single house-keeping unit" held not to exclude a college sorority); *Robertson v. Western Baptist Hospital,* 267 S.W.2d 395 (Ct. of Appeals of Ky.1954) (use of a residence as a home for about 20 nurses constituted a permitted use under a "single housekeeping unit" test); *Boston–Edison Protective Ass'n v. Paulist Fathers,* 306 Mich. 253, 10 N.W.2d 847 (1943), 306 Mich. 253, 10 N.W.2d 847, 148 A.L.R. 364 (approved the use of a dwelling house in a highly restricted district as a residence for Roman Catholic priests). *Miller,* 515 A.2d at 907.

*Id.* at 449–50, 979 A.2d 98.

What was said in the excerpts just quoted regarding non-uniform judicial interpretations of the phrase "single family" when that term is undefined but used in an ordinance is equally true when the term "single family" is undefined and used in a restrictive covenant. *See Rigelhaupt, supra,* 71 A.L.R.3d at 699–700:

The term "family" is a deceptively simple one. Webster's Third New International Dictionary gives more than a

quarter of a column of definitional material, grouped under seven major headings.

In its most common connotation, the term implies a biological relationship or some other relationship, such as marriage or adoption, sanctioned by law and given the same or similar legal consequences as the biological relationship. In this restricted sense, the term may, for purposes of this discussion, be subdivided into the "nuclear family," consisting only of parents and their children, and the "extended family," consisting of the entire group of persons enjoying a biological or legal family relationship, including such collateral relationships as grandparents and grandchildren, uncles, aunts, nieces, and the like.

The sense of the term "family" has, however, often been extended to include others, such as servants, living with a biologically or legally related group, and the term may also be used in a sense equivalent to "household," as including any group which lives together under a common head and uses common facilities.

*Id.*

Some cases, in determining whether the term "single family" is ambiguous when used in a restrictive covenant, have looked to the definition of that term as used in zoning ordinances as some indication of what the term logically might mean. *Newman v. Wittmer,* 277 Mont. 1, 917 P.2d 926, 930 (1996) (collecting cases); *Turner v. United Cerebral Palsy Asso.,* 772 P.2d 628, 630 (Colorado Court of Appeals, 1988) ("While the zoning statute has no direct applicability to private covenants, it is some indication of the type of groups that might logically, as a matter of public policy, be included within the concept of a single family.") *Hill v. The Community of Damien of Molokai,* 121 N.M. 353, 911 P.2d 861, 867 (1996) (same).

In *Hill, supra,* the New Mexico Supreme Court was called upon to interpret a covenant that read:

No lot shall ever be used for any purpose other than *single family residence purposes.* No dwelling house located

thereon *shall ever be used for other than single family residence purposes,* nor shall any outbuildings or structure located thereon be used in a manner other than incidental to such *family residence purposes.* The erection or maintenance or use of any building, or the use of any lot for other purposes, including, but not restricted to such examples as stores, shops, flats, duplex houses, apartment houses, rooming houses, tourist courts, schools, churches, hospitals, and filling stations is hereby expressly prohibited.

911 P.2d at 865. (Emphasis added).

The issue arose in *Hill* because a lot owner was using his property for a group home for four unrelated individuals who suffered from AIDS and needed some degree of home nursing care. *Id.* In *Hill,* the trial court ruled that the use of the property for the care of the AIDS patients violated the "single family" use restriction set forth in the covenant. *Id.* The New Mexico Supreme Court reversed. *Id.* The court said:

The Neighbors also argue on appeal that the four unrelated residents of the group home do not constitute a "single family" as required by the restrictive covenant. The Neighbors contend that the restrictive covenant should be interpreted such that the term "family" encompasses only individuals related by blood or by law. We disagree.

The word "family" is not defined in the restrictive covenant and nothing *in the covenant suggests that it was the intent of the framers to limit the term to a discrete family unit comprised only of individuals related by blood or by law. Accordingly, the use of the term "family" in the covenant is ambiguous.* As we noted above, we must resolve any ambiguity in the restrictive covenant in favor of the free enjoyment of the property. *Cain* [*v. Powers* ], 100 N.M. [184] at 186, 668 P.2d [300] at 302 [ (1983) ]. This rule of construction therefore militates in favor of a conclusion that the term "family" encompasses a broader group than just related individuals and against restricting the use of the property solely to a traditional nuclear family.

In addition, there are several other factors that lead us to define the term "family" as including unrelated individuals. First, the Albuquerque municipal zoning ordinance provides a definition of family that is at odds with the restrictive definition suggested by the Neighbors. The Albuquerque zoning ordinance includes within the definition of the term "family" as "any group of not more than five [unrelated] persons living together in a dwelling." Albuquerque, N.M., Rev. Ordinances, Art. XIV, § 7–14–5(B)(41)(1974 & Supp. 1991).

The Neighbors argue that the zoning code definition is irrelevant to the scope of the covenant. They point to *Singleterry v. City of Albuquerque*, 96 N.M. 468, 470, 632 P.2d 345, 347 (1981), in which this Court stated, "It is well established that zoning ordinances cannot relieve private property from valid restrictive covenants if the ordinances are less restrictive." However, we agree with the Colorado Court of Appeals which noted. *"While [the zoning] statute has no direct applicability to private covenants, it is some indication of the type of groups that might logically, as a matter of public policy, be included within the concept of a single family "* . . . In the present case, we are not using the zoning ordinances to relieve the Community of its obligations under the restrictive covenant. We are instead looking to the definition of family within the zoning ordinance as persuasive evidence for a proper interpretation of the ambiguous term in the covenant. The Albuquerque zoning ordinance would include the residents of the group home within its definition of family.

*Id.* at 867–68. (Emphasis added).

We agree with the *Hill* Court's analysis. The term "single family" could mean that the property is restricted to use by persons related by blood, marriage, or adoption. But the term could logically also have a broader meaning such as the definition set forth in section 225–25B in the Wicomico Zoning Code or as set forth in section 1–142(a) of the Baltimore City Zoning Code.[4]

---

**4.** Section 1–142 of the Baltimore city Zoning Code provides:

Another case we find persuasive is *Crowley v. Knapp*, 94 Wis.2d 421, 288 N.W.2d 815 (1986). The restrictive covenant at issue in *Knapp* stated that the property's use "shall be restricted to . . . one single family dwelling . . . for residential purposes only." *Id.* at 816. The word "family" was not defined in the covenant. The issue presented was whether the Knapps, without violating the covenant, could use a house they owned to house eight intellectually disabled individuals. *Id.* at 821. The eight individuals were "high functioning," and were able to take care of their personal needs and to help with cooking but were to be under the supervision of a "non-professional" couple who would serve a "parental role" for the eight. *Id.* at 821. The trial judge enjoined the proposed use, after construing the word "family" so as to restrict the use of the land to single family residences "occupied by a group of people related to one another by blood or marriage and who reside in such dwelling as a single housekeeping unit." *Id.* at 822. In *Knapp*, the Wisconsin Supreme Court reversed the trial judge's decision. *Id.* at 824–25. The Court opined that the trial judge's definition of "family" was too restrictive. *Id.* The *Knapp* court explained:

a) *In general.*
"Family" means one of the following, together with usual household helpers:
   (1) an individual;
   (2) or more people related by blood, marriage, or adoption, living together as a single housekeeping unit in a dwelling unit; or
   (3) a group of not more than 4 people, who need not be related by blood, marriage, or adoption, living together as a single housekeeping unit in a dwelling unit.
(b) *Roomers included.*
"Family" includes, with respect to those listed in subsection (a)(1) or (2) only, up to 2 roomers within the dwelling unit, as long as:
   (1) they share a common entrance and cooking and bathroom facilities; and
   (2) in the case of a multiple-family dwelling, no more than 2 roomers are in the entire dwelling, regardless of the number of dwelling units. [ ]
(c) *Exclusions.*
In no case, does more than 4 unrelated people, a rooming house, a hotel, or a fraternity or sorority house constitute a family.
*See Armstrong, supra,* 410 Md. at 434, n. 15, 979 A.2d 98.

The court consistently holds that public policy *favors the free and unrestricted use of property.* Accordingly, restrictions contained in deeds and in zoning ordinances must be strictly construed to favor unencumbered and free use of property. *McKinnon v. Benedict,* 38 Wis.2d 607, 619, 157 N.W.2d 665 (1968); *State ex rel. Bollenbeck v. Village of Shorewood Hills,* 237 Wis. 501, 297 N.W. 568 (1941); *Cohen v. Dane County Board of Adjustment,* 74 Wis.2d 87, 91, 246 N.W.2d 112 (1976). In *Cohen,* we cited Rathkopf, 1 *The Law of Zoning and Planning* (4th ed.), ch. 9, at p. 9.1, for the proposition that restrictions on the use of property are to be construed in favor of free use. A provision either in a zoning ordinance or in a deed restriction which purports to operate in derogation of the free use of property must be expressed in clear, unambiguous, and peremptory terms.

This rationale was employed in *Missionaries of La Salette v. Whitefish Bay,* 267 Wis. 609, 66 N.W.2d 627 (1954). In that case, the Village of Whitefish Bay, by zoning ordinance, purported to restrict the use of property in the particular district to *single-family dwellings.* The ordinance defined "family" as "one or more individuals living, sleeping, cooking, or eating on premises as a *single housekeeping unit.*" (p. 611). In *La Salette,* the building in a residential neighborhood was occupied by a group of priests and lay brothers, who at no time exceeded eight in number. The two lay brothers did the housekeeping and prepared and served the meals. The priests lived at the home but performed their *religious duties elsewhere. The Village of Whitefish Bay argued that the term "family" was restricted in meaning to a group of individuals related to one another by blood or marriage.* This court disagreed, relying upon the public policy that restrictions placed upon the use of land must be strictly construed. We stated that a violation of a zoning ordinance can only occur when there is a plain disregard of limitations imposed by express words. The court, relying upon *Bollenbeck, supra,* said:

"Covenants restricting the use of land are construed most strictly against one claiming their benefit and in favor of

free and unrestricted use of property; a violation of the covenant occurs only when there is a plain disregard of the limitations imposed by its express words." (p. 614)

The court pointed out that this rule is equally applicable to private deed restrictions and building and zoning ordinances. The court held *that the Missionaries of Our Lady of La Salette were not in violation of the zoning restriction, because the ordinance did not expressly define a "family" to exclude all who are not related by blood or marriage relationship.* The court stated:

"Had it been the pleasure of the legislative body when defining the word 'family,' to have excluded in the district any dwelling use of premises there situated, by a group of individuals not related to one another by blood or marriage, it might have done so. Since there is a complete absence of any such limitation, it seems clear that it was not the legislative intent to restrict the use and occupancy to members of a single family related within degrees of consanguinity or affinity." (p. 615)

The court went on to discuss the ordinary meaning of the word, "family":

"It is to be noted that aside from the definition of the term 'family' in the ordinance, the ordinary *concept of that term does not necessarily imply only a group bound by ties of relationship.*"

" 'Family' is derived from the Latin word *'familia.'* Originally the word meant servant or slave, but now its accepted definition is a collective body of persons living together in one house, under the same management and head subsisting in common, and directing their attention to a common object, the promotion of their mutual interests and social happiness."

In *La Salette,* this court said that the term, "family," did not necessarily exclude from its *meaning a group of unrelated persons living together in a home.* The court held that the eight priests who lived, slept, cooked, and ate upon the premises as a single housekeeping unit were not in violation

of the zoning ordinance. It concluded that the term "family," would not be *construed to import the requirement of consanguinity or affinity between the* parties when those requirements were not expressly set forth. By *dicta,* the court expanded its holding by stating:

"The arrangement appears to be no different than were a group of school teachers, nurses, etc., in some collective capacity, to acquire the premises, use the same as a residence from the group, and pursue their avocations away from the place." (pp. 616–17)

\*        \*        \*

The factual similarity between the nature of the occupancy of the priests and the persons in the Knapp Home is striking, and the term, *"family," used in imposing the purported restriction is identical. La Salette* held that *in legal usage, unless otherwise defined, a family may mean a group of people who live, sleep, cook, and eat upon the premises as a single housekeeping unit.* Moreover, as was also pointed out in *La Salette,* the commonly held understanding of the term, "family," like its legal usage, *"does not necessarily imply only a group bound by ties of relationship." Id.* at 615, 66 N.W.2d 627. *If the meaning of that term is to be further limited, the limitation must be expressly stated. As in La Salette, the restrictive covenant in the present case did not define "family" to be a group related by consanguinity or marriage.*

288 N.W.2d. at 822–26. (Emphasis added).

In *Danaher v. Joffe,* 184 N.C.App. 642, 646 S.E.2d 783 (2007) the North Carolina Court of Appeals was called upon to interpret the meaning of a restrictive covenant that contained a usage restriction, which provided that "[n]o lot shall be used except for single family residential purposes." *Id.* at 784. The owner of the lot leased a house to seven University of North Carolina students who were on a baseball team together. *Id.* at 787. The trial court held that the owners were in violation of the usage restriction. *Id.* The North Carolina Court of Appeals agreed with the trial judge in that regard

because the evidence indicated that the students, although close personal friends, did not consider themselves to be a "family" or anything "more than close personal friends and teammates." The *Danaher* Court went on to say, however, that the trial court improperly issued an injunction because the injunction enjoined the property owners from permitting "more than one person to occupy the subject property unless the persons occupying the same *are related by blood or marriage or is a group of persons otherwise structured in the same way as the traditional view of an American family.*" (emphasis added). The court held that such an injunction was not supported by North Carolina case law. Citing *Hobby & Son v. Family Homes,* 302 N.C. 64, 274 S.E.2d 174, 179 (1981) and *Winding Ridge Homeowner's Association, Inc. v. Joffe,* 184 N.C.App. 629, 646 S.E.2d 801 (2007).

Unlike the situation in *Danaher,* the trial judge in the subject case was not asked to provide a full definition of what the term "family" meant as used in the restrictive covenant nor was the court called upon to decide whether the particular living arrangements by the three college students constituted a family use. Instead, as mentioned earlier, the trial judge was simply asked to determine whether the restrictive covenant was violated whenever a residence was used by persons unrelated by blood, marriage, or adoption. As can be seen, the *Danaher* court, like the trial judge in this case, was of the view that the "related by blood, marriage, or adoption" was too narrow. *Id.* at 647–648, 646 S.E.2d 783.

In its opening brief, the appellant asserts that "[i]f the Judge had looked at the plain meaning of the language . . . "single family" back in the 1960s when these covenants were drafted, he would have known the common understanding for that term would not have included unrelated people or college students." The problem with that argument, however, is that the Association points to nothing in the record that would have provided the trial judge with such knowledge. Moreover, while there are some cases from other jurisdictions that, prior to 1961, interpreted the term "single family" to mean persons living together who are related by blood, marriage, or adop-

tion (*see supra* at pages 136–38, 56 A.3d at 366–67), the great majority of cases that have considered the matter, whether construing the term "single family" as used in zoning ordinances or as used in a restrictive covenant, have held that the term is ambiguous and does not necessarily restrict usage of property to persons related by blood, marriage, or adoption. *See* cases cited *supra* at 136–38, 56 A.3d at 366–67; *see also Rigelhaupt*, 71 A.L.R.3d at 703. ("[It has generally been recognized that there need be no consanguinity between the members of the group residing together where there is no such requirement in the zoning regulations or restrictive covenant.]")

In support of its position, the Association, in its opening brief, relies primarily on *Lowden v. Bosley, supra.* According to appellant, in the *Lowden* case the Court of Appeals was "faced with a very similar situation and [a] very similarly worded covenant and restrictions." The restrictive covenant in *Lowden* was somewhat similar to the one here at issue but the issue actually before the court was quite different. Section 8.1 of the Declaration construed by the *Lowden* Court read as follows:

> "Uses. All lots shall be **used for single family residential purposes only.** No structure of a temporary character whether a basement, tent, shack, trailer, camper, or other out-building will be placed on any Lot at any time as a permanent or temporary residence."

*Lowden,* 395 Md. at 61, 909 A.2d 261.

The issue presented in *Lowden* was whether the restrictive covenant at issue prohibited the owner of homes built on lots in the subdivision from renting the homes to residential tenants on a short term basis. *Id.* at 60, 909 A.2d 261. The *Lowden* court held that the covenant at issue was unambiguous in that regard and did not prohibit the short term rentals to a single family of a home. *Id.* at 67, 909 A.2d 261. In reaching its decision, the Court focused upon the meaning of the term "residential purposes" as used in the covenant and not on the term "single family."

The *Lowden* Court concluded its decision by mentioning the fact that the petitioner argued on appeal that because there was no provision in the rental management agreement that expressly stated that the tenants renting a particular home must be related the "single family" portion of the restrictive covenant was violated. *Id.* at 72, 909 A.2d 261. The court gave short shrift to this argument. It pointed out that there was nothing in the rental agreement stating that the several separate and distinct families, or unrelated individuals, *could* rent a particular home at the same time. The rental agreement was silent on this issue. *Id.* at 72–73, 909 A.2d 261. The Court stated that given the fact that there was no evidence presented to the Circuit Court as to whether the home had been, or was then being rented to different families or to different individuals, there was no basis for the Circuit Court to have found a violation of the "single family" provision on that basis. Accordingly, the *Lowden* Court held that the Circuit Court "properly declined to make such a finding." *Id.* at 72, 909 A.2d 261. In the words of the *Lowden* Court, "it is not an issue generated by the evidence in the case, and we have no occasion to explore the meaning or application of the "single family" restriction." *Id.*

Appellant argues that because the *Lowden* Court found the covenant at issue in that case unambiguous, and because the covenants in the subject case are "similarly worded," this Court should therefore find the covenant "unambiguous." That argument has no merit. The fact that the phrase "residential purposes" was held *to be unambiguous has no possible bearing on whether the term at issue here ("single family")* is, or is not, ambiguous.

The Association also stressed that in the course of its opinion, the *Lowden* Court said that the "single family" restriction set forth in section 8.1 of the restrictive covenant "may" prohibit the use of the property for "fraternity houses, hotels, motels, boarding houses, and bed and breakfast" uses. *Id.* at 68–69, 909 A.2d 261. From the *dicta* just quoted, appellant argues:

If that single family provision may exclude things that are not "single family" and the court sees fraternity houses (college students) and boarding houses (unrelated persons under one roof) then, therefore, this court should rule that unrelated persons living together do not constitute a "single family."

We fail to see the logic of this argument. It is the equivalent of arguing that because the Court of Appeals "considers" *some* groups of unrelated individuals living together under one roof as not constituting a "family," therefore, the Court of Appeals interprets the term "family" to mean that no combination of unrelated persons living together can constitute a family.

In its brief, appellant relies on two cases that interpret zoning ordinances that define "single family" so as to include persons living in a "single housekeeping unit." *City of White Plains v. Ferraioli*, 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756, 758 (1974) and *Open Door Alcoholism Program v. Board of Adjustment*, 200 N.J.Super. 191, 491 A.2d 17, 21 (1985). Those cases are inapposite because, as already mentioned, the term "single family" is not defined in the covenant that governs the South Kaywood subdivision.

Appellant also cites as authoritative the dissenting opinion in *Danaher v. Joffe*, 184 N.C.App. 642, 646 S.E.2d 783, 788 (2007) where the dissenting judge opined that the term "single family" should not be given an overly narrow construction but instead should tolerate "occupancy by one person; by more than one person if related by blood, marriage, or adoption; or by a group that is structured substantially like a family (i.e., an 'integrated unit')." *Id.* at 788–89. It is unclear why appellant cites this dissent, because in the trial court, the Association never asked the trial court to adopt such a broad definition of "family."

Although the Association devotes a substantial portion of its brief trying to convince us that the covenant prevents houses in the subdivision from being used by any person not related by blood, marriage, or adoption, in other parts of its brief it

takes a diametrical opposite position, when it argues that we should define family as having the same meaning as "familial status" as that phrase is defined in some statutes. The Association asserts:

The closest the State Legislature has gotten to a definition for single-family is found in Md.Code, State Government [Article], § 20–701, in which the legislature defines "familial status" as:

"one or more minors who are domiciled with: (1) a parent or other person having legal custody and the minor; or (ii) the designee of a parent or other person having legal custody of the minor with the written permission of the parent or other person. (2) "Familial status" includes the status of being: (i) a pregnant woman; or (ii) an individual who is in the process of securing legal custody of a minor ... [and that] (f) ... 'Family' includes a single individual."

and also in Md.Code, Business Occupations and Professions, § 17–322(a) in which the State Legislature has declared that "familial status" will have the means indicated in "The Federal Fair Housing Act." In fact, the language in Md.Code, State Government, § 20–701, is identical to the wording in The Federal Fair Housing Act, 42 U.S.C.

In the "Conclusion" section of the Association's reply brief, it asserts: [5]

Appellants ask this court to define single-family as the Maryland State Legislature already has in Md.Code, State Government, § 20–701 and Md.Code, Business Occupations and Professions, § 17–322(a), as the federal government already has in the Federal Fair Housing Act, 42 U.S.C.

---

**5.** In the "Conclusion" section of the Association's opening brief, the relief requested differs markedly from what it asks for in the "Conclusion" part of its reply brief. The "Conclusion" section of the appellant's opening brief reads:

The Order below should be reversed and the Covenants and Restrictions limiting the subdivision to single families should be found unambiguous and excluding more than two unrelated individuals from renting the subject houses in the subdivision.

§ 3602 as Wicomico County has in their zoning code § 225–46. . . .

There are several problems with this request. First, in the trial Court, the Association never asked that the term "single-family," as used in the covenant, be declared to have the same meaning as the term "familial status" as used in the statutes it cites. Second, even if such a declaration had been requested, we can think of no reason, and the Association suggests none, why we should conclude that the drafters of the covenant intended that the definition suggested should be utilized. Third, even if the drafters of the restrictive covenant intended that the phrase "single family" should have the same definition as "familial status," as that term is used in the statutes mentioned, a group of people living together could achieve "familial status" even if they were not related by blood, marriage, or adoption. For example, if a mother gave written consent to her best friend to have custody of her [the mother's] three minor children, the best friend and the children would achieve "familial status." Lastly, the definition of single family that the Association espoused in the trial court was that two or more persons related by blood, marriage, or adoption, must live together; but this is at odds with the definition of the term "family" as defined in the Federal Fair Housing Act, section 3602(c). That subsection states [6] that "family" includes "a single individual." *See* also, the definition of "familial status" as set forth in section 20–701(e) of the State Government Article, which allows a person living alone to achieve "familial status."

■ For all the reasons set forth above, we hold that the restrictive covenant is ambiguous. Because the phrase is

---

6. We also note that the definition of "single family" suggested by the appellant in the trial court (two or more persons living together who are related by blood, marriage, or adoption) would appear to mean that a landlord who rented a house to an unmarried heterosexual couple or to an unmarried same sex couple would violate the covenant. Such a prohibition would appear to violate Md.Code, State Government Article § 20–705(1), which, with exception not here relevant (see § 20–704(a)(2)), forbids discrimination in rentals based on marital status or sexual orientation.

ambiguous, and because no evidence was presented to the trial court that showed what the drafters of the covenant intended, the ambiguity must be construed against appellant, the party seeking its enforcement. Therefore, the trial judge did not err when he ruled that the restrictive covenant did not prevent the Longs from renting their property to persons not related by blood, marriage or adoption.

We shall vacate the portion of the trial judge's declaration in which the court declared that: 1) three unrelated college students living together did not violate the restrictive covenant and 2) that the rental arrangement between the coeds and the Longs did not violate any provisions of the Wicomico Zoning Ordinance. The Complaint filed by the Longs simply did not call upon the court to make a declaration as to those uses.

## V.

### Other matters.

The Association claims that the trial Judge committed reversible error when he [purportedly] told counsel for appellant, prior to the commencement of trial, that "he didn't want to hear any horror stories" about the way the three coeds were using the house located at 1602 South Kaywood Drive. According to appellant, when the judge made this statement, its counsel retorted: "this goes to use and occupancy," whereupon the judge replied that he didn't want to hear such evidence "because that's not what we are here for." Appellant now contends that the court committed reversible error by, *sua sponte*, excluding "relevant" evidence. Counsel for appellees asserts that the trial judge did not make the statement attributed to him by appellees and, in any event, this issue is not preserved for appellate review. We agree that the issue is not preserved. Nothing in the record shows that the trial judge made the remark attributed to him. And, even if the court did make the remark, appellant failed to protest the court's restriction as to what could be proven. Thus, there is nothing in the record for us to review. See Md. Rule 8–131(a). (Except for the issue of subject matter juris-

diction, an appellate court will not ordinarily decide any other issue that is neither raised or decided below.) Also, appellant never made a proffer in the trial court as to what would have been proven had the court not excluded evidence. "Where the evidence is excluded, a proffer of substance and relevance must be made in order to preserve the issue for appeal." *Sutton v. State,* 139 Md.App. 412, 452, 776 A.2d 47, *cert denied,* 366 Md. 249, 783 A.2d 223 (2001) (citation omitted). *See also Mack v. State,* 300 Md. 583, 603, 479 A.2d 1344 (1984) (a ruling excluding evidence is not preserved for appellate review "unless there has been a formal proffer of what the contents and relevance of the excluded testimony would have been.") (Citations omitted).

**JUDGMENT DECLARING THAT THE RESTRICTIVE COVENANT DID NOT PROHIBIT THE LANDOWNERS FROM RENTING THEIR PROPERTY TO PERSONS NOT RELATED BY BLOOD, MARRIAGE, OR ADOPTION AFFIRMED; ALL OTHER DECLARATIONS VACATED; COSTS TO BE PAID BY APPELLANT.**